# In re M-D-, Respondent

*Decided March 13, 1998*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

An alien who did not provide any evidence to corroborate his purported identity, nationality, claim of persecution, or his former presence or his family's current presence at a refugee camp, where it was reasonable to expect such evidence, failed to meet his burden of proof to establish his asylum claim.

FOR RESPONDENT: Robert J. Sidi, Esquire, New York

FOR IMMIGRATION AND NATURALIZATION SERVICE: Sue Chen, Assistant District Counsel

BEFORE: Board En Banc: DUNNE, Vice Chairman, VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, GUENDELSBERGER, and JONES, Board Members. Dissenting Opinions: SCHMIDT, Chairman; ROSENBERG, Board Member.

HURWITZ, Board Member:

In an oral decision dated July 24, 1996, an Immigration Judge found the respondent deportable based on his own admissions, and denied his applications for asylum and withholding of deportation under sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h)(1994). The Immigration Judge granted voluntary departure pursuant to section 244(e) of the Act, 8 U.S.C. § 1254(e)(1994). The respondent has appealed from the denial of his applications for asylum and withholding of deportation. The appeal will be dismissed.

## I. FACTUAL BACKGROUND

The respondent testified that he is a half-black Mauritanian national who is a member of the Peurh ethnic group. He bases his asylum claim on past persecution and a well-founded fear of future persecution on account of his race and ethnicity. According to the respondent's testimony, a group of five white and two black Maurs from the military came to the respondent's house in the village of Nouadhibou in Mauritania on June 15, 1990. The police accused the respondent and his family of being Senegalese. They demanded to see the

respondent's identity documents, which the Maurs destroyed. The respondent was then separated from his parents, wife, and siblings, all of whom resided in the home. His family members were arrested and forced to cross the river into neighboring Senegal, but the respondent was beaten, blindfolded, thrown into a car, and taken to the village of M'Bagne, where he was imprisoned. He was placed in a large cell with about 50 other black prisoners. During the respondent's detention from June 1990 until December 1991, he and the other prisoners were forced to perform hard labor, primarily carrying bricks and working the farmland. He also suffered repeated beatings by the white Maurs, one of which left a permanent scar on his left knee. During another beating, one of his teeth was knocked out by a blow to the face. The respondent also described being burned with cigarettes.

The respondent also testified that on the day of his release, he and two other prisoners were summoned by the guards and taken by jeep to the river's edge. Initially, they were placed in a boat, but then the officers forced the respondent and the other prisoners into the river at gunpoint and ordered them to swim to the other side. They screamed to get the attention of a passing Senegalese fisherman, who transported them to Senegal. After reaching the shore and resting, the respondent walked 4 hours to the refugee camp in Horefode, where he joined his family. He testified that he remained at the camp for 11 months. Concerned by rumors that Mauritanians in the camp would be sent back to Mauritania, the respondent fled to the city of Dakar in November 1993, leaving his wife and family behind in the refugee camp, where they remain to this day. In Dakar, he earned money working at the harbor. On January 15, 1994, he paid the equivalent of $60 to travel by boat from Dakar to the United States and landed in Miami on February 20, 1994.

## II.  IMMIGRATION JUDGE'S DECISION

The Immigration Judge's denial was based on a finding that the respondent had failed to meet his burden of proof. Specifically, the Immigration Judge noted (1) that the respondent offered no documentation to support his claim that he is a Mauritanian citizen; (2) that the respondent provided no letters or affidavits from family members to corroborate his claim that he was arrested and detained by the authorities or that his family was expelled from Mauritania; (3) that the respondent offered no explanation as to why he decided to leave his entire family in the Senegalese refugee camp; and (4) that the respondent was unable to obtain confirmation of his or his family's presence and registration at the refugee camp, even after the Immigration Judge granted him a continuance for that express purpose. The Immigration Judge found "the respondent's inability or unwillingness to provide supporting documentation to seriously undermine the plausibility of his account, particularly since he has not offered the type of specific, credible detail about the circumstances underlying his period of detention for almost two years in

Mauritania and the circumstances of his residence at the refugee camp in Senegal."

## III. APPLICABLE LAW

An asylum applicant bears the evidentiary burden of proof to establish his or her asylum claim. 62 Fed. Reg. 10,312, 10,342 (1997) (to be codified at 8 C.F.R. § 208.13(a)) (interim, effective Apr. 1, 1997). To establish eligibility for a grant of asylum, an alien must demonstrate that he is a "refugee" within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994). *See* section 208 of the Act. That section defines "refugee" as any person who is unable or unwilling to return to her home country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. An applicant for asylum has established that his fear is "well founded" if he shows that a reasonable person in his circumstances would fear persecution. *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). Furthermore, asylum, unlike withholding of deportation, may be denied in the exercise of discretion to an alien who established statutory eligibility for the relief. *INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987); *Matter of Mogharrabi, supra*. To establish eligibility for withholding of deportation pursuant to section 243(h) of the Act, an alien must demonstrate a clear probability of persecution in the country designated for deportation on account of race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic,* 467 U.S. 407 (1984). This means that the alien must establish that it is more likely than not that he would be subject to persecution for one of the grounds specified in the Act. *Id*.

With regard to burden of proof, we have held that where an alien's testimony is the only evidence available, it can suffice where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of the alien's alleged fear. *Matter of Dass*, 20 I&N Dec. 120, 124 (BIA 1989); *see also Matter of Mogharrabi, supra*, at 446 (BIA 1987). However, we explained that the introduction of such evidence is not "purely an option" with the asylum applicant; rather, corroborating evidence should be presented where available. See *Matter of Dass, supra*, at 124.

We recently reiterated and clarified this holding in *Matter of S-M-J-*, 21 I&N Dec. 722, 724 (BIA 1997), where we held that general background information on country conditions must be included in the record as a foundation for an asylum claim. In that case, we stated that "[w]here the record contains general country information, and an applicant's claim relies primarily on personal experiences not reasonably subject to verification, corroborative documentary evidence of the asylum applicant's particular experience is not required." *Id*. at 725. However, we explained that "*where it is reasonable*

*to expect* corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided . . . [or] an explanation should be given as to why such information was not presented." *Id*. (emphasis added). The absence of such corroboration can lead to a finding that an applicant has failed to meet his burden of proof. *Id*. at 725.

## IV. ANALYSIS

In the case at bar, we find that the respondent has not provided sufficient evidence to meet his burden of proof. We acknowledge that the respondent has submitted numerous articles and reports regarding general country conditions in Mauritania and the oppression of black Mauritanians on account of their race. Furthermore, the record contains a country profile prepared by the Department of State. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Mauritania - Profile of Asylum Claims & Country Conditions* (July 1995) [hereinafter *Profile*]. However, we note the conspicuous lack of documentary evidence corroborating the specifics of the respondent's testimony.

As an initial matter, there is no evidence to confirm the respondent's purported Mauritanian nationality, a central element in his claim. No passport, birth certificate, or identification card has been submitted by the respondent, although we note that the respondent testified that his identity documents were destroyed by the Maurs upon his arrest. It would be reasonable to expect the respondent to attempt to obtain some identity documentation or to adequately explain why replacement documentation was not available. However, even were we to excuse the production of identity documents in this case, we note that the respondent often communicates with his sister who lives in Senegal, outside the refugee camp. We do not find it unreasonable to expect some type of corroboration from the sister in the form of a letter or affidavit, especially given her frequent contact with the respondent. We further note that while he communicates with his sister primarily by telephone, the respondent testified to having received at least one letter from his sister. Neither this letter, nor any other correspondence or affidavits substantiating the respondent's testimony, has been submitted into the record. *See Matter of S-M-J-, supra*, at 725 (stating that an applicant should provide "documentary support for material facts which are central to his or her claim and easily subject to verification"). Such evidence should be produced where it is available. *See Matter of Dass, supra*, at 124.

Likewise, the respondent has submitted no supporting evidence from his family, despite the fact that his sister maintains regular contact with them in the refugee camp. We find it reasonable to expect some corroboration of the respondent's identity, arrest, and detention, or at least of the family's forcible expulsion from Mauritania.

Finally, the respondent has provided no evidence of his former presence at the refugee camp in Senegal, where he claims to have lived for 11 months. He admits that he and his family were issued refugee cards by the United Nations, but claims that he lost his refugee card. Significantly, even after the Immigration Judge granted the respondent a 7-week continuance in which to obtain official verification from the United Nations High Commissioner for Refugees ("UNHCR") of his presence at the camp, he was unable to do so. The respondent was also unable to offer evidence confirming his family's presence in the camp, despite the fact that his family has been living there for the past 7 years and continues to reside in the camp.[1] *See Matter of S-M-J-, supra*, at 725 (stating that specific documentary corroboration is required where it is "of the type that would normally be created or available in the particular country and is accessible to the alien").

## V. CONCLUSION

Given the complete lack of evidence corroborating the specifics of the respondent's asylum claim, we agree with the Immigration Judge that the respondent has failed to sustain his burden of proof. We find it reasonable in this case to expect basic documentation of nationality and identity, as well as confirmation of his or his family's presence at the refugee camp. These are "material facts which are central to [the respondent's] claim" and which are "reasonably subject to verification." *Matter of S-M-J-, supra*, at 725. Furthermore, we find significant the lack of any explanation for the respondent's inability to obtain such verification. Due to the respondent's failure to produce such evidence or to satisfactorily explain its absence, we conclude that the respondent has failed to meet his burden of proof in establishing his claim to asylum or withholding of deportation under sections 208 and 243(h) of the Act. *See* 62 Fed. Reg. 10,312, 10,342-43 (1997) (to be codified at 8 C.F.R.

---

[1] The respondent's attorney admitted not only that he was unable to obtain verification of the respondent's presence at the camp, but that he had in fact received a negative response from the United Nations. We note that Board Member Rosenberg has appended to her dissenting opinion a December 29, 1997, letter from the UNHCR, which was not contained in the record of proceedings (App. A). In this letter, the organization expresses concern over the accuracy of its refugee verification process with regard to Mauritanian asylum-seekers from Senegal. The letter states that "[a] 'negative' response from our Offices in Senegal, however, should not be construed as implying that the individual concerned is not a refugee nor a Mauritanian," and that verification, or lack thereof, should not "substitute for a full assessment of evidence." We agree with these notions. Our holding in this case does not impose an affirmative requirement of UNHCR verification of an alien's presence in a refugee camp, nor do we hold that a "negative response" from the UNHCR is dispositive on the issue of burden of proof. We reiterate, however, that the respondent bears the burden of proof in establishing eligibility for asylum. In the instant case, our determination that the respondent has failed to meet this burden is not based solely upon the lack of UNHCR verification, but rather upon the complete lack of *any* evidence to corroborate the respondent's purported identity, nationality, or claim of persecution.

§§ 208.13, 208.16(b) (interim, effective Apr. 1, 1997); *INS v. Cardoza-Fonseca, supra; INS v. Stevic, supra; Matter of Dass, supra*. Accordingly, we will dismiss the respondent's appeal.

**ORDER:** The respondent's appeal is dismissed.

**FURTHER ORDER:** Pursuant to the Immigration Judge's order and in accordance with our decision in *Matter of Chouliaris*, 16 I&N Dec. 168 (BIA 1977), the respondent is permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure to so depart, the respondent shall be deported as provided in the Immigration Judge's order.

*DISSENTING OPINION:* Paul W. Schmidt, Chairman

I respectfully dissent.

## I. INTRODUCTION

The issue in this case is whether the respondent has met his burden of establishing a well-founded fear of persecution. Both the Immigration Judge and the majority conclude that respondent has not provided sufficient evidence to meet his burden of proof. In my view, the respondent has met his burden of proof, and the burden imposed upon him by the majority is too high.

It is well settled that an alien's testimony alone can suffice to meet his burden of proof in an asylum case if the testimony is "believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of the alien's alleged fear." *Matter of S-M-J-*, 21 I&N Dec. 724, 722 (BIA 1997); *see also Matter of Dass*, 20 I&N Dec. 120 (BIA 1989); *Matter of Mogharrabi,* 19 I&N Dec. 439 (BIA 1987). The respondent's testimony meets that test. Moreover, the respondent has submitted considerable documentary evidence regarding country conditions in his native Mauritania which support his claim. *See Matter of S-M-J-, supra.*

## II. THE RESPONDENT'S TESTIMONY

The respondent testified that he was born in Nouadhibou, Mauritania, as were his mother and father. He and his father were farmers in Mauritania. They owned cows and sheep. The respondent testified that on the evening of June 15, 1990, seven people came to his house. He knew they were in the military because they had uniforms and guns. Five were white and two were black Maurs. He and his family, including his father, his mother, his wife and siblings, were arrested. They were asked for their papers, and when his father showed them his license and his papers: "[T]hey tear it up. They tear it up and they said we are not Mauritanians we are from Senegal."

The respondent testified that he was then separated from his family, and "[T]hey beat me, they mistreated me, they hide my eyes, they throw me in a car, then they took me." He stated that his eyes remained blindfolded for 24 hours and he was taken to M'Bagne, about 15 minutes from his village. He said there were other prisoners in the car with him, whom he could hear but not see. When his blindfold was removed the next evening, he was in a big cell with other black and half-black people. There were about 50 people in the room with him.

The respondent testified that he lived in this cell for well over a year and a half. During this time he was frequently beaten, and he sustained scars to his head and knee. He went to the prison's hospital for treatment and was given stitches on one occasion. He also lost a tooth as a result of the beatings. The people who ran the jail were Maurs. The respondent and the other prisoners were forced to work. They moved bricks at construction sites, worked the farms of the Maurs, and gave the cows water. They were not paid for this work. According to the respondent's testimony, "[T]he pay was just to be . . . beaten," and they were not given "even a penny" for their labor. During this time, the respondent was never charged with any crime, never brought before a judge, never permitted to meet with a lawyer.

The respondent further testified that one day, he and two other men were called and put into a boat. He had no notice that he would be leaving the prison. He noted that people from the prison were taken "little by little," never many at a time. They were driven in a jeep to the River of Senegal, a trip of less than 10 minutes. They were taken out onto the river and forced at gunpoint to jump overboard. They screamed at some Senegalese fishermen who picked them up and took them to the Senegal side of the river. The respondent stated that he swallowed some water while in the river and it took him 2 hours to recover from that.

When they arrived in a village on the Senegal side of the river, the respondent and the other men were told that that was not a good place to be and they should go to the refugee camp in Horefode. They walked 4 to 5 hours before arriving there. The respondent found his entire family in that camp. He stated that the people in the camp were refugees and there were no white people or black Maurs in the camp. The respondent testified that he owned no property in Senegal and was given no documents by that country's government.

The respondent further testified that he stayed in the refugee camp for about 11 months, then spent about a month in Dakar before coming by boat to the United States. He left Senegal because he heard that they were trying to return the Mauritanians in Senegal to Mauritania, and he was afraid if he returned there he would be killed. He said the trip to the United States took 1 month and 5 days. He paid about $60.00 to be on the boat. He got out of the boat in Miami and took a bus to New York.

The respondent was asked why he did not take his wife with him when he left the refugee camp. The transcript is garbled on this point, but does offer

some explanation. The respondent answered, "[B]ecause . . . because I did not have a destination where I'm going. I did not even know where I was going and I did not (indiscernible) my wife (indiscernible) problems."

The respondent was able to describe the Mauritanian flag in detail. He knew the names of three ethnic groups besides his own that live there. Asked if he had attended school, the respondent replied that he had studied and could read the Koran. He indicated that he cannot write.

## III.  ANALYSIS OF RESPONDENT'S TESTIMONY AND THE BURDEN OF PROOF

This description shows the respondent's testimony to be very specific and very detailed. The respondent's testimony also was consistent. In fact, neither the Immigration Judge nor the majority has pointed to any inconsistencies in the respondent's testimony. The respondent's asylum application contains little detail, but its contents are consistent with the respondent's testimony.

The respondent's testimony is also believable and plausible. In this regard, I note that both the Immigration Judge and the majority acknowledge that black Mauritanians have suffered oppression and persecution on account of their race. The background information provided by the respondent fully supports that fact. Indeed, this uncontroverted evidence indicates that those who control the Mauritanian Government have systematically forced blacks into detention, even slavery, and exile from their own country because of their race. This evidence further reflects that during the period of 1989 to 1991, when the respondent claims to have been arrested, imprisoned, and exiled, there were massive human rights abuses committed against African Mauritanians, and that some 70,000 were expelled or fled, hundreds were killed, and hundreds more were tortured and maimed. *See* Committees on International Relations and Foreign Relations, 104th Cong., 2d Sess., *Country Reports on Human Rights Practices for 1995* 165 (Joint Comm. Print 1996).

Thus, we have in this case not just testimony which is believable, consistent and detailed, and which provides a plausible and coherent account of the basis for the respondent's fear. We also have documentary evidence to substantiate that fear.

The majority, however, finds this is not enough. Like the Immigration Judge, it finds that the respondent's inability to provide documentary evidence relating to his specific claim is fatal to his case. Quoting *Matter of S-M-J-, supra,* at 725, the majority notes that "'*where it is reasonable to expect*'" corroborating evidence for certain alleged facts, such evidence must be provided. *Matter of M-D-*, 21 I&N Dec. 1180, 1182 (BIA 1998). It finds a "conspicuous lack of documentary evidence" to corroborate the specifics of the respondent's testimony. It notes that the respondent has no evidence even to prove his nationality, and that he was unable to come up with evidence of

his former residence at the refugee camp, despite being given 7 weeks specifically to obtain such documentation. The majority also notes the lack of proof of the respondent's family's residence in the camp, and the fact that the respondent, while admitting that he received a letter from his sister in Senegal who lives outside the refugee camp, did not submit any letter.

The fact that the respondent was unable to obtain a document verifying his, or his family's, stay in a refugee camp does not establish that the respondent was not there, or that he is not who he claims to be. Indeed, the process of obtaining a document from a refugee camp has not been shown to be foolproof, and there is no basis for concluding that such a document is readily available.

The Department of State has reported that in June of 1996, the United Nations High Commissioner for Refugees ("UNHCR") entered into an agreement with the Mauritanian Government under which the UNHCR would assist in government efforts to issue identity and other documents to Mauritanians returning from refugee camps in Senegal. *See* Committees on Foreign Relations and International Relations, 105th Cong., 1st Sess., *Country Reports on Human Rights Practices for 1996* 173 (Joint Comm. Print 1997). This would indicate that many of the refugees in those camps were without documents, and that it very well may not be "reasonable to expect" the respondent to provide refugee or other identifying documents. Absent evidence that a refugee document is readily available to aliens in the respondent's position, the absence of such a document should not detract from his overall consistent and plausible testimony. Certainly the absence of such a document should not have such dire consequences as it has had in this case.

I recognize that the Department of State 1995 country profile for Mauritania cautions that persons fleeing Senegal and claiming persecution on account of ethnicity "could actually be Senegalese claiming to be Mauritanian refugees." Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Mauritania - Profile of Asylum Claims & Country Conditions* 6 (July 1995) [hereinafter *Profile*]. The *Profile* goes on to note that in the "absence of a census on the refugee population in Senegal (which should begin soon) and refugee identity cards, the only reliable method of confirming citizenship would be to trace family trees." *Id.*

The majority is evidently concerned that this respondent may be Senegalese. However, his detailed and specific testimony regarding his background and his arrest, his lengthy detention, and his exile, which was unembellished during cross-examination, *see Matter of B-*, 21 I&N Dec. 66 (BIA 1995), does not support such a concern in this case. I further note that the *Profile* also suggests the difficulty of obtaining refugee and other reliable identifying documents. The difficulty of obtaining such documents, however, should not lead us to simply assume that the respondent is not who he professes to be, that is, Mauritanian.

Further, the fact that the respondent did not present the one letter he said he received from his sister also should not detract from his case. As noted by the majority, the respondent testified that he usually maintained contact with his sister by telephone. The respondent was not asked what happened to the one letter he received, the importance of which to his case he may not have realized at the time he received it. The respondent indicated that he could not write, and there is nothing in the record to suggest that his sister is more literate than he is. Arranging to send a letter may be difficult for the sister. Moreover, requesting a letter at this point could well be perceived as an effort to fabricate evidence.

The record in this case contains general country information which supports the respondent's story. The respondent himself provided considerable detail regarding his claim. Those details were particular to his claim. Under these circumstances, I would not require additional corroborating evidence. The evidence presented adequately establishes that the Government of Mauritania arrested the respondent and his family, detained the respondent for a long period of time, beat him regularly, subjected him to forced labor, and eventually forced him to leave his country because his is black.

## IV. CONCLUSION: THE RESPONDENT SUFFERED PERSECUTION

I find that the harm suffered by the respondent constitutes past persecution on account of race. A finding of past persecution gives rise to a presumption that the respondent has a well-founded fear of future persecution. *See Matter of H-*, 21 I&N Dec. 337 (BIA 1996). There is nothing in the record to indicate that conditions for blacks in Mauritania have changed to such an extent that the respondent would no longer have a well-founded fear of persecution if returned to that country. Thus the presumption has not been overcome. *See* 62 Fed. Reg. 10,312, 10,342 (1997) (to be codified at 8 C.F.R. 208.13(b)) (interim, effective Apr. 1, 1997); *Matter of H-, supra*.

For these reasons, I would sustain the respondent's appeal and grant his application for asylum. Therefore, I respectfully dissent from the dismissal of his appeal.

*DISSENTING OPINION*: Lory D. Rosenberg, Board Member

I respectfully dissent.

I find that the asylum-seeker provided credible testimonial evidence that he is a citizen of the country in which he claims persecution, and that he actually experienced past persecution by virtue of the harm he suffered. He was arrested by the Mauritanian military and repeatedly beaten while he was imprisoned in a cell for over a year (to the point he required hospitalization, lost a tooth, and bears scars from some of those beatings), and forced to perform slave labor until he was ultimately expelled and forced to cross into

Senegal. Accordingly, I believe that he has met the burden of proof required to establish a well-founded fear of persecution on a ground protected under section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a) (42)(1994).

In the recent precedent decisions of the Board, the majority seems to suggest that an individual in this man's position has not met his burden of proof and that it is appropriate to deny him asylum. *Matter of Y-B-*, 21 I&N Dec. 1136 (BIA 1998); *see also Matter of A-S*, 21 I&N Dec. 1106 (BIA 1998); *Matter of O-D-*, 21 I&N Dec. 1079 (BIA 1998); *cf. Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997). In my view, these recent precedents have impermissibly diminished our statutory obligations (which mirror those assumed by virtue of our accession to the 1967 Protocol Relating to the Status of Refugees),[1] which incorporated the provisions of the 1951 Convention,[2] by wrongly elevating technical evidentiary tests—which often are misapplied, as I believed occurred here—over our obligation to provide refugee protection. *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva, 1992) [hereinafter *Handbook*]; *see also Matter of S-M-J-, supra; Matter of A-S-, supra* (Rosenberg, dissenting); *Matter of Y-B-, supra* (Rosenberg, dissenting); *Matter of O-D-, supra* (Rosenberg, dissenting).[3]

Similarly, I disagree with the approach taken and the interpretation of law relied upon by the majority in deciding this appeal. I believe that the majority's decision is at odds with the holdings of the United States Court of Appeals for the Second Circuit, in which circuit this appeal arises. The Second Circuit has held that in the absence of documentary proof, the applicant's testimony will be enough if it is "credible, persuasive, and refers to '*specific* facts that give rise to an inference that the applicant has been or has a good reason to fear that he or she will be singled out for persecution.'" *Osorio v. INS*, 18 F.3d 1017 (2d Cir. 1994) (quoting Cardoza-Fonseca v. INS, 767 F.2d

---

[1] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[2] United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150.

[3] I have articulated my many substantial differences with the majority's approach to reviewing and determining eligibility for asylum under the Act in great detail in other previously published dissenting and concurring opinions, covering various aspects of asylum jurisprudence, including *Matter of A-E-M-*, 21 I&N Dec. 1157 (BIA 1998); *Matter of E-P-*, 21 I&N Dec. 860 (BIA 1997); *Matter of V-T-S-*, 21 I&N Dec. 792 (BIA 1997) (Rosenberg, dissenting); *Matter of T-M-B-*, 21 I&N Dec. 775 (BIA 1997) (Rosenberg, dissenting); *Matter of C-A-L-,* 21 I&N Dec. 754 (BIA 1997); see also my views as stated in separate opinions in *Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997) (Rosenberg, concurring); *Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997) (Rosenberg, concurring); *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996) (Rosenberg, concurring).

1448, 1453 (9th Cir. 1985), *aff'd*, 480 U.S. 421 (1987)); *see also Sotelo-Aquije v. Slattery*, 17 F.3d 33, 36 n.2 (2d Cir. 1995) (finding that corroborating evidence is not required), *rev'd on other grounds,* 62 F.3d 54 (2d Cir. 1995); *Carranza-Hernandez v. INS*, 12 F.3d 4, 7 (2d Cir. 1993). What is more, the majority itself recognizes that the governing regulations promulgated by the Attorney General as well as our own precedent contemplate that "[t]he testimony of the applicant, if credible may be *sufficient to sustain the burden of proof without corroboration.*" 62 Fed. Reg. 10,312, 10,342 (1997) (to be codified at 8 C.F.R. § 208.13(a)(interim, effective Apr. 1, 1997) (emphasis added); *see also Matter of S-M-J-*, 21 I&N Dec. 722, 724 (BIA 1997); *Matter of Dass*, 20 I&N Dec. 120, 124 (BIA 1989); *Matter of Mogharrabi,* 19 I&N Dec. 439, 446 (BIA 1987).

Consequently, although the dispositive issue, in whole or in part, already may have been addressed in related precedent decisions in which my views did not prevail, a repeated dissent in which a decision-maker refuses to yield to the views of the majority has been recognized as constituting a statement by the judge as an individual: "Here I draw the line." Justice William J. Brennan, *In Defense of Dissent*, 37 Hastings L. J. 427 (1986). Therefore, I dissent.

## I. CREDIBLE, PERSUASIVE TESTIMONY GIVING RISE TO AN INFERENCE OF PERSECUTION EXISTS

My goodness, this is a credible asylum-seeker who has presented testimony that is specific, consistent, and limited in detail only to the extent that he is unable to write, and who, beyond being taught to read the Koran, may be functionally illiterate. *Cf. Matter of Mogharrabi, supra*. Surely, we are not simply imposing a greater than normal burden of proof because he is Black and could be from another African country such as neighboring Senegal? Ironically, this is precisely what the seven Mauritanian soldiers who persecuted the respondent contended when on a June 1990 night, they rousted the respondent and his family from their farm, took their animals, arrested and beat them, and before tearing apart the respondent's family—ripped up the license and identity papers the respondent's father gave them. According to the respondent's testimony, "[T]hey tear it up and said we are not Mauritanians we are from Senegal."

My dissenting colleague, Chairman Paul W. Schmidt, has noted that the testimonial evidence presented by the respondent (who indicated he was essentially illiterate with the exception of being able to read the Koran) reflected his knowledge of Mauritania as to its flag and tribal populations, and established a consistent account of the mistreatment and persecution he experienced. The substance of the respondent's claim, including the timing of the attack on him and his family, is supported by country condition evidence contained in the record and certainly gives rise to an inference that the respondent is Mauritanian and that he has been persecuted.

The most recent State Department report on conditions in Mauritania supports the respondent's claim that African-Mauritanians were expelled from Mauritania to Senegal from 1989-1990. Committees on Foreign Relations and International Relations, 105th Cong., 1st Sess., *Country Reports on Human Rights Practices for 1996,* 173 (Joint Comm. Print 1997)[hereinafter 1996 *Country Reports*]. According to the report, there were massive human rights abuses committed against African-Mauritanians during the period of 1989 to 1991, when thousands were expelled or fled, and hundreds were arrested, tortured, and killed.[4] The report notes that successive government regimes have vigorously pursued a policy of "Arabization" of the schools and the work force, which has the effect of serious discrimination against non-Hassaniya-speaking African-Mauritanians. In addition, the Department of State country report on Mauritania for 1994 which is contained in the record before us on appeal, states that "the Government has so far failed to set up clear administrative procedures for expellees wishing to obtain confirmation of the citizenship and associated rights." Committees on Foreign Relations and International Relations, 104th Cong., 1st Sess., *Country Reports on Human Rights Practices for 1994* 159, 163 (Joint Comm. Print 1995) [hereinafter 1994 *Country Reports*].

## II. INABILITY OF ASYLUM APPLICANTS TO OBTAIN INDIVIDUAL CORROBORATING DOCUMENTS

Moreover, as I, joined by two of my colleagues, have argued in dissent in *Matter of Y-B-, supra*, a document from a refugee camp, even assuming that such evidence goes to the heart of the respondent's claim because it may corroborate who he professes to be, has not been shown to be foolproof or even readily available. There is persuasive evidence that, given the circumstances that inhere in a Senegalese refugee camp, identification or "resident in the camp," documents are hard to come by. Barring evidence that such a document is readily available, the absence of a certificate concerning the respondent's presence in a refugee camp should not detract from the fact that he has met his burden on the basis of consistent and plausible testimony. *See Aguilera-Cota v. INS*, 914 F.2d 1375, 1380 (1990); *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1984); 62 Fed. Reg. 10,312, 10,342-43 (1997) (to be codified at 8 C.F.R. §§ 208.13(a), 208.16(b)(interim, effective Apr. 1, 1997). To rely, even in part, on the absence of such a document to deny asylum would be contrary to law and an abuse of discretion. But that is precisely what the majority chooses to do.

---

[4] Given the fact that we just have completed an en banc review of several cases involving asylum seekers from Mauritania, two of which we have designated as precedents, the majority is or should be well aware of the serious human rights violations—including torture, summary execution, mass expulsion, and slavery (official and unofficial)—that have been perpetrated by Mauritanian authorities against black African-Mauritanians.

The Department of State has reported that of the approximately 70,000 African-Mauritanians who were expelled or fled to Senegal in 1989-1991, an estimated 55,000 refugees remain in camps in Senegal, and the UNHCR has only recently begun to assist in the issuance of identity documents to refugees contemplating returning to Mauritania. *1996 Country Reports, supra*, at 177. As I noted in *Matter of Y-B-, supra*, it is not improper to take notice administratively that refugee camps in developing third world countries often lack the staff or advanced computer resources that would provide the accuracy necessary to treat the absence of any record as more than a mere anecdotal factor.[5] As the UNHCR has explained:

> [I]n countries where assistance is provided, separate registration systems usually exist, with varying degrees of quality, for refugees in camps, in urban areas, those living among local populations, those who are not assisted, etc. . . . To address these deficiencies, UNHCR has continued to review and improve its own registration practices. With time, improved registration systems will make statistics on populations of concern to UNHCR . . . more reliable.

*Refugees and Others of Concern to UNHCR: 1996 Statistical Overview* (Office of the United Nations High Commissioner for Refugees, Washington, D.C.), 1996 at 3-4.

In addition, regrettably, the Regional Office for the United States and the Caribbean of the Office of the United Nations High Commissioner for Refugees has found it necessary to curtail its efforts to supply verification of those Mauritanian asylum-seekers claiming to have been in refugee camps in Senegal. *See* "Re: Mauritanian Asylum-Seekers From Senegal in the United States," (Dec. 29, 1997)[6] (withdrawing from prior participation in attempting to verify an asylum-seeker's presence in a UNHCR operated refugee camp in Senegal on the basis of the heightened demand for and unavailability of reliable documentation, and the office's growing awareness that the lack of such specific documentation has been given undue weight in determining credibility when "knowledge of conditions in the applicant's country" is the "most important element in assessing an applicant's credibility). *Cf. Matter of Y-B-, supra.*

In declining to participate in our "verification" process, the UNHCR stated its concerns plainly. Principally, the UNHCR questioned the usefulness of the confirmation exercise, noting practical limitations such as accuracy, completeness, or accessibility of records. Then, the UNHCR noted that United States adjudicators routinely are questioning the identity and

---

[5] The doctrine of taking "official" or administrative notice refers to circumstances under which an agency considers evidence other than that adduced in the context of an adversary hearing to simplify the process of proof. Such evidence normally is that which is commonly acknowledged or for which an adequate rebuttal opportunity is provided the opposing party. McCormick, *McCormick on Evidence*, § 359, at 1029 (1988); *see also* Katherine J. Strandburg, *Official Notice of Changed Country Conditions in Asylum Adjudication: Lessons from International Refugee Law*, 11 Geo. Immigr. L.J. 45 (Fall 1996). The Board has supported taking administrative notice. *Matter of H-M-,* 20 I&N Dec. 683 (1993).

[6] Reproduced in Appendix A of this decision.

nationality of these asylum-seekers and indicated that the lack of a UNHCR record was not intended to be "construed as implying that the individual concerned is not a refugee nor a Mauritanian" and that "other methods for establishing identity and credibility be employed." Finally, the UNHCR concluded that "the lack of specific documentation from our Office in support of [Mauritanian claims] has been given undue weight in determining . . . credibility . . . . [I]t is frequently necessary to give the applicant the benefit of the doubt . . . . It should be borne in mind that it is often difficult or impossible to obtain documentary support of an asylum-seeker's claim . . . . *We would not want verification, or lack of verification, of refugee registration in Senegal to substitute for a full assessment of evidence . . . in the form of coherent and plausible testimony, consistent with conditions in the applicant's country.*" App. A (emphasis added); *cf. Matter of M-D-*, 21 I&N Dec. 1180, 1184 n.1 (BIA 1998).

The majority opines that the respondent should have been able to get some more documentary evidence. Of what sort? A single letter that the respondent mentioned he received from his sister—which, incidentally, was not mailed, but hand carried by someone traveling to the United States—hardly is likely to satisfy the majority's concerns for corroboration of the respondent's nationality or presence in the refugee camp. In addition, the respondent did not testify to "frequent contact" with his sister as the majority contends, but stated that he was able to call her "every now and then." He stated that he has had no contact with his wife because she remains in the refugee camp,[7] that he tried to send a letter to the camp and it was never answered, that he did not know whether it was possible to receive or send mail from the camp, and that he relied on his one sister, who is married to a Senegalese and living in Senegal, to obtain news of his family.

Our articulation of the need to obtain corroborating documentary evidence is, or should be, *a corollary* to an evidentiary standard that holds that objective evidence can be presented through testimony. Our imposition of that corollary must take into account the accepted reality that asylum-seekers are often unable to obtain corroboration of facts specific to their circumstances. *See Matter of S-M-J-, supra*, at 724; *Matter of Dass, supra*, at 124; *Matter of Mogharrabi, supra,* at 446; *see also Bolanos-Hernandez v. INS, supra*, 1284-88 (recognizing that persecutors are not likely to provide their victims with evidence of their motives); *Cardoza-Fonseca v. INS, supra*, at 1453 (noting that establishment of objective facts through testimony alone does not make them any less objective).

The majority purports to understand the essential qualification at the heart of this corollary—that *when it is reasonable* to expect such evidence could be

---

[7] I note that the respondent's preceding his family in leaving the camp is consistent with the documented history of men preceding their families in cases of migration and immigration, as the majority was forced to acknowledge at least implicitly in *Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997); *see also id.* (Rosenberg, concurring).

obtained and submitted, *either* the evidence, *or* a reasonable explanation for the lack of it should be presented. *Matter of M-D-, supra*, at 1182-83. Nevertheless, without ever stating *why* it is reasonable to expect that a functionally illiterate Mauritanian, whose documents were seized in Mauritania and torn up, and who was ultimately exiled from Mauritania, should be able to produce identity documents, the majority treats the respondent as though he should have had access to such documents. *But see* 1995 *Country Reports, supra,* at 163.

Similarly, the majority unreasonably expects this functionally illiterate respondent to obtain and provide affidavits from his family in a refugee camp, when he cannot even contact them, when conditions in that camp are such that the UNHCR has acknowledged the difficulty of verifying his or their presence there, and when it is likely that members of his family, like him, are illiterate. Certainly, it is highly unlikely that even if they could be located, their family relationship to him could be substantiated by valid and acceptable certifications, or that, if written statements were provided for their signature or mark, a notary public would be available in the camp.

The majority has the standard wrong—it is that documentary evidence in support of material facts central to the claim should be provided *when such facts are "easily subject to verification." Matter of S-M-J-, supra*, at 725 (emphasis added). The majority ignores the respondent's explanation for being unable to produce identity documents, which is that they were destroyed before he was exiled from his country, and focuses on the respondent's "inability to explain" the unavailability of *replacement* documents. *Matter of M-D-, supra*, at 1184 n.1. They also ignore his testimony that he has not been able to establish direct contact with his family in the refugee camp. *Cf. Matter of S-M-J-, supra* (Rosenberg, concurring) (expressing concern that the tendency to disbelieve the uncorroborated testimony of asylum-seekers, which may have formed, in part, the subtext of our requirement of documentation, may skew our assessment of any explanation given for the lack of documentation). And, despite their protestations to the contrary, they rely inordinately on the absence of documentation from the UNHCR verifying his or his family's presence in the refugee camp.[8]

---

[8] I also note that, assuming such documentation *is* available, it is the responsibility of the adjudicator to assist the respondent in obtaining corroborating documentation, if such documentation *is* available. Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* paras. 196, 205(b)(I), at 47, 49 (Geneva, 1992) [hereinafter *Handbook*], (cited with approval in our decision in *Matter of S-M-J-, supra,* at 729 (stating that "while the burden of proof in principle rests on the applicant, the duty to ascertain and evaluate all the relevant facts is shared between the applicant and the examiner" and that it is the Immigration Judge's role to "[e]nsure that the applicant presents his case as fully as possible and with all available evidence")).

## III. PAST PERSECUTION AND WELL-FOUNDED FEAR OF PERSECUTION IN MAURITANIA HAS BEEN ESTABLISHED

This is a case that the majority has characterized as one in which the respondent's burden of proof is on the line. But the respondent has provided credible and accurate testimony of his knowledge of Mauritania, and of his physical mistreatment, injuries, and other persecution suffered on account of his race, which is specific and internally consistent, containing detail that can be verified as plausible in light of known country conditions. *Matter of Mogharrabi, supra; see also* App. A (stating that the UNHCR believes a full assessment of coherent and plausible testimony is required and that the benefit of the doubt should be extended to the asylum-seeker when documentation is unavailable); *Osorio v. INS, supra; Sotelo-Aquije v. Slattery, supra.* The Immigration and Naturalization Service has provided no evidence controverting the respondent's claims. It is unlikely, assuming that his credible claims of being a virtually illiterate black Mauritanian peasant are true, that the respondent could provide documentation to support his claims of being ousted from his own farm land, being beaten and suffering scars. In supposed recognition of circumstances such as these, we have stated that we would not expect him to provide such documentation. *Matter of S-M-J-, supra.*

Likewise, when one is a refugee from a country in which the government military destroyed his identification and expelled him, the impediments to obtaining identification documents that normally would be issued by the government should be obvious. The existence of such an impediment is further substantiated by the 1995 *Country Reports*, which indicated that the government has no established means of providing verification of citizenship. *Matter of S-M-J-, supra,* at 725 (recognizing that because the asylum applicant is obviously not required to "'prove'" every element of his case, "'when all available evidence has been obtained and checked'" and where the adjudicator "'is satisfied as to the applicant's general credibility'" "'[i]t is therefore frequently necessary to give the applicant the benefit of the doubt'"(quoting *Handbook, supra*, paras. 203-04, at 48)); *Matter of Y-B-, supra*, (Rosenberg, dissenting)(emphasizing the need to give a credible asylum-seeker the benefit of the doubt).

Is the respondent's uncontroverted and consistent testimony and documentation of country conditions not enough to establish both past persecution and a well-founded fear of future persecution by a preponderance of the evidence? *Cf. INS v. Cardoza-Fonseca, supra.* Apparently, not for the majority. Apparently it is not sufficient to establish eligibility for asylum by an individual who is African and has been persecuted and treated as a slave. This is a decision I cannot join. Consequently, here I draw the line.

## APPENDIX A
December 29, 1997

**Re: Mauritanian asylum-seekers from Senegal in the United States**

Dear Madam/Sir:

For more than two years our Office has been receiving requests from attorneys, Immigration Judges and Asylum Officers pertaining to the verification of camp residency and refugee registration in Senegal of Mauritanian asylum-seekers in the United States. Some requests have entailed verifying the authenticity of documents ("*recepisses*" in this case) issued by the Senegalese Government. However, the unabated flow of verification requests that our Office continues to receive from various sources has prompted a number of concerns that we would like to share with you.

First, our Office has come to question the continuation and usefulness of the verification exercise for all the parties concerned when more than 95 percent of those who claim to have been registered in camps in Senegal are said to be unknown both to our Offices in Senegal and the Senegalese Ministry of Interior. For example, for the period covering August 1997, our Office sent 109 verification requests to Senegal, and only three individuals were said to have been registered. UNHCR's role in verifying whether or not an individual was registered or recognized as a refugee in another country of asylum depends upon the availability of complete, accurate and accessible records, either in its possession or that of the country of first asylum (in this case Senegal). While the UNHCR Offices in Dakar and Saint Louis, Senegal, have access to government registration records, it is not always possible for UNHCR to account for the accuracy or reliability of data compiled and maintained by the relevant national authorities. The question as to how *recepisse*-holders could have these documents (assuming they are authentic) without having been registered is both logical and interesting, but for which our Office has no answer.

Second, and in relation to the prior paragraph, adjudicators are apparently questioning the identity/nationality of the "unknown" individuals seeking asylum. Are these individuals really Mauritanian refugees who were previously recognized as refugees in Senegal? Hitherto, UNHCR's role has been that of confirming, or otherwise, whether a Mauritanian individual was previously registered as a refugee in Senegal. A "negative" response from our Offices in Senegal, however, should not be construed as implying that the individual concerned is not a refugee nor a Mauritanian.

It should be underlined that it is conceivable to encounter cases of individuals who could claim to have been refugees in a certain country, including Senegal, but who left that country without prior registration. These individuals would not possess *recepisses*, unless they were led to believe that having a

*recepisse* is a pre- condition for filing an asylum application, a perception that might prompt the acquisition of fraudulent documents.

It has come to our attention that the lack of specific documentation from our Office in support of asylum claims for Mauritanians has been given undue weight in determining the credibility of such claims. We suggest that other methods for establishing identity and credibility be employed. We stress that in these cases, as in all asylum adjudications, an important element in assessing an applicant's credibility is knowledge of conditions in the applicant's country. In the context of an initial credibility determination it may be necessary for the examiner to conduct further interviews to clarify apparent inconsistencies and resolve any contradictions and to find explanations for any misrepresentations or concealment of material facts. Although the applicant's statements must be coherent and plausible and not contradict generally known facts, it is frequently necessary to give the applicant the benefit of the doubt.

It should be borne in mind that it is often difficult or impossible to obtain documentary support of an asylum-seeker's claim, especially from countries that have suffered and continue to suffer from periods of turbulence, or from countries that have hosted refugees as a result of such turbulence. We would not want verification, or lack of verification, of refugee registration in Senegal to substitute for a full assessment of evidence that is given in the form of coherent and plausible testimony, consistent with conditions in the applicant's country.

Third, the numbers involved—our Office receives on average 100 requests per month—have been overwhelming. UNHCR Offices in Washington and in Senegal do not, unfortunately, have the necessary and adequate resources to respond promptly and effectively to these requests, given other pressing preoccupations. Had our joint efforts been yielding useful results, it would certainly have warranted that we continue the verification exercise. As the last two years have proven, however, the "unknown" responses outnumber, by far, the affirmative answers received from Senegal.

In light of the foregoing, and without any prejudice to Mauritanian asylum-seekers, our Office has decided to cease facilitating the process of verifying whether or not Mauritanian asylum-seekers were registered as refugees in Senegal.

Counting on your understanding, I remain,

Yours sincerely,

Anne Willem Bijleveld
Regional Representative