NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0579n.06
Filed: August 14, 2006

No. 05-3595

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SAIDOU ALPHA NIANG, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON PETITION FOR REVIEW OF AN |
| v. | ) | ORDER OF THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| ALBERTO GONZALES, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: GILMAN and GRIFFIN, Circuit Judges; and DUGGAN, District Judge.[*]

GRIFFIN, Circuit Judge.

Petitioner Saidou Alpha Niang ("Niang"), a native and citizen of Mauritania, seeks review

of a final order of removal issued against him by the Board of Immigration Appeals ("BIA") on

April 19, 2005. In its order, the BIA summarily affirmed the decision of an Immigration Judge

("IJ") denying Niang's request for asylum and withholding of removal. Niang has timely petitioned

_____

[*]The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of
Michigan, sitting by designation.

this court for review of his request for asylum.[1]  Specifically, Niang asserts that the BIA incorrectly

affirmed the erroneous legal conclusions and factual findings of the IJ.

We grant the petition for review, vacate the order of the BIA, and remand for further

proceedings.

I.

Petitioner Niang is a citizen and native of Mauritania applying for asylum in the United

States.  Niang is a Black Mauritanian, an ethnic group that has been historically persecuted by the

White Moors and the Black Moors, two of Mauritania's main ethnic groups.

According to Niang, in 1989 he was arrested by White Moors who came to his house, took

his identification, and told him that he was Senegalese and not Mauritanian.  On that occasion, he

was taken to a camp for four months, after which he was deported to Senegal.  He remained in

Senegal from 1989 to 2000, then returned to Mauritania.  Niang met and married his wife while in

Dakar, Senegal, in 1994; she is currently living in Dakar.  According to Niang, his wife had

documentation in her possession showing that she was a refugee in Senegal.

Niang testified that, in 2000, he joined the "AC" party.  It is undisputed that "AC" is an

acronym for the "Action for Change" political party.  Niang testified that the AC party was the party

of "Ibrahim Sar," a recognized leader of the party.  However, when asked "What does [sic] the

---

[1]Niang did not raise the denial of his petition for withholding of removal in his brief on appeal and has accordingly waived the issue. *See Shkabari v. Gonzales*, 427 F.3d 324, 327 n.1 (6th Cir. 2005).

initials AC *stand for*?" (emphasis added), Niang stated "I say AC mean his culture, his country and

his language." His further testimony on this subject was as follows:

> Q.      And the organization is just called AC? Do the initials AC spell out
> anything? Is there a full name of the organization, of the party?
>
> A.      AC is the party name.
>
> Q.      There's no other name other than the AC?
>
> MR. LEATHERWOOD TO JUDGE
>
> Objection, Your Honor, been asked and answered more than once.
>
> * * *
>
> JUDGE TO MR. LEATHERWOOD
>
> I'll, I'll overrule the objection for the purpose of measuring the respondent's
> credibility, Mr. Leatherwood.
>
> MR. FLOWERS TO SAIDOU ALPHA NIANG
>
> Q.      Now, Mr. Niang, is AC known by any other name?
>
> A.      We call AC, mean to us your culture, your tribe, your right.

Niang testified that he would attend AC meetings "once a month," but, as an uneducated

person, did not attend the "educated people meetings." Niang did not have any documentation to

show that he was an AC member, asserting that "they" were planning to give him a membership

card, "but the problem happen [the 2002 arrest], and they haven't give us."

Niang stated that Ibrahim Sar was an AC deputy who held a seat in the Mauritanian

parliament. In 2002, Sar gave a speech during a parliamentary session denouncing the oppression

of the black Mauritanian population. Following his speech, the Mauritanian security forces arrested and detained Sar, which triggered protests by the black Mauritanian population. Niang was at the protest, and the protestors filled a stadium and yelled phrases such as "help us," "give us our rights," and "do not let the White Moors deny our rights." "Military people" came in trucks, and he and other participants were arrested and beaten with batons. Niang was imprisoned for four days at a police station, during which he was "investigated" for two hours each morning, beaten, and asked "why you are demonstrating." The police also asked Niang to leave the AC party and join their party (the Democratic and Social Republican Party ("PRDS")).

According to Niang, after four days at the police station, he was taken to a military camp and remained there for two months, where he was asked to join the "president party" (PRDS) every morning. Niang also claimed that he was beaten often, perhaps six times a day. The camp authorities eventually released Niang on the condition he report back to the military camp on a monthly basis. They told Niang that if they were to find him at a demonstration, he would be severely punished.

The dates on which Niang actually reported back to the military camp are unclear. During cross-examination, Niang stated that he stopped reporting to the police in June 2002 because he had left Mauritania to go to Senegal, then the United States. He also indicated that he reported to the police only once, in April 2002. Although his testimony regarding the dates of his departure was confusing, Niang consistently testified that, after his stay in the military camp, he feared for his life and decided to flee Mauritania.

The IJ denied Niang's application for asylum. In doing so, the IJ found that Niang was not credible because of (1) Niang's failure to state what the initials "AC" stand for, and (2) contradictory and confusing testimony concerning the timing of his departure from Mauritania and when he actually reported to the police. The IJ alternatively held that, even if Niang were credible, he failed to establish his burden of proof for asylum. The IJ noted that Niang failed to present corroborative evidence of "crucial portions of his claim," including a party membership card, or documentation that he was a refugee in Senegal. The IJ stated that it would be reasonable to expect corroboration of the claims about his wife and family when his roommate, who testified at the hearing, claimed to have recently visited Niang's family. Furthermore, the IJ held that Niang's account of the soccer stadium events had not been sufficiently corroborated.

On April 19, 2005, the BIA affirmed the IJ's decision pursuant to 8 C.F.R. § 1003.1(e)(4)(I) without opinion. The IJ's decision is now considered the final agency determination. 8 C.F.R. § 1003.1(e)(4). This timely appeal followed.

II.

Niang asserts in his petition for review that the record evidence does not support the IJ's adverse credibility finding, and, therefore, the IJ erred. Although Niang acknowledges that the factual findings of the IJ are afforded substantial deference by this court, he contends that the inconsistences in his testimony did not go to the "heart" of his claim and were therefore immaterial. We agree.

An IJ's adverse credibility findings are afforded substantial deference, so long as the findings are supported by specific reasons. *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004). Thus, this court reviews findings of adverse credibility to determine whether the underlying grounds for these findings were sufficient. *Id.* To affect a petitioner's application for asylum, "[a]n adverse credibility finding must be based on issues that go to the heart of the applicant's claim." *Id.* Findings of incredibility cannot be based upon irrelevant inconsistencies in the evidence presented to an IJ, *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004), and if the apparent discrepancies cannot be viewed as attempts by the applicant to enhance his claim of persecution, they have no bearing on credibility, *id.* at 623 (internal citation and quotation omitted). *See Pergega v. Gonzales*, 417 F.3d 623, 627-29 (6th Cir. 2005) (holding that IJ's credibility determination was not supported by the record because "[w]hether [applicant] *reported* the kidnapping and beating to the police is less relevant than the fact that he was *actually* kidnapped and beaten.").

The IJ cited two problems with Niang's testimony. First, the IJ stated that "the Court would expect that somebody who was willing to demonstrate for a political party and even go to jail for that party would know the name of the party." According to the IJ, Niang offered only "generalized and vague descriptions of what the AC party stands for." Second, the IJ found that Niang's testimony was confusing with respect to his departure from Mauritania, his arrival in Senegal, and his arrival in the United States. The IJ noted that Niang testified three times that he left Mauritania on June 23, 2002, for Senegal, then later testified that April 23, 2002, was his departure date.

Further, the IJ found a similarly confusing pattern concerning Niang's testimony about when he was expected to report to the Mauritanian police, and when he actually did report.

Following our review of the record, we are unable to affirm the IJ's credibility findings, despite our deferential standard of review. First, the record evidences a large amount of confusion stemming from poorly phrased questions and perhaps poorly translated questions. We doubt that Niang was aware that he was supposed to expound on the *official title* of the AC party when asked what AC "stand[s] for," as opposed to the *principles* of the party. Furthermore, as argued by Niang:

> Many organizations are identified by acronyms such as the AARP, NASA, NAACP and even the USCIS. Counsel would venture to guess that there are many members or employees of these organizations who could not accurately identify what word each letter represents. It is certainly not evidence of incredibility and should not be treated as such.

Second, we disagree that Niang's alleged lack of knowledge regarding the official title of the "AC" party is dispositive. Niang represented himself not as a "key" party member, but rather as an uneducated member who attended monthly meetings and joined because he was "told AC would help us get our right." He described Ibrahim Sar as a leader of the party, and testified that AC meant "his culture, his country, and his language" and "your culture, your tribe, your right." Niang's point that many organizations are more widely known by their acronyms than their official titles is well-taken. From the record before us, Niang's proffered description of the AC evidenced a level of knowledge consistent with his education and claims. More fundamentally, Niang's lack of knowledge of the official title does not go to the "heart" of Niang's claim.

Third, the record is confusing as to the dates the IJ found important. Niang's application for asylum states that he left Mauritania in April 2002. Niang likewise testified on direct examination that he fled in April 2002. Niang also testified that he reported for the first and only time to the military camp, after his release, on April 1, 2002. Nevertheless, his I-589 stated that "when [I] stopped reporting in June 2002, soldiers came home looking for me." On cross-examination, Niang was asked about this discrepancy, and a very confusing dialogue followed. On appeal, Niang contends that the testimony is consistent: he reported once in April 2002, fled, and his failure to report in June prompted the soldiers to come looking for him.

Like the issue of the party title, we are not persuaded that the discrepancy over his departure date goes to the "heart" of Niang's claim. Although the IJ made findings regarding Niang's testimony with respect to the dates, he did not find Niang's testimony that he was beaten in a military camp incredible. This court reviews the credibility findings of an IJ pursuant to a very high standard, *see Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (holding an IJ's credibility determinations are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"), but we cannot conclude that the instant record or decision contains specific reasons that go to the heart of Niang's claim, *see Sylla*, 388 F.3d at 926.

### III.

In his second assignment of error, Niang argues that the IJ and the BIA erred in holding that he had failed to satisfy his burden of proof on his claim for asylum. To obtain asylum, the applicant bears the burden of proving qualification as a refugee. *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th

Cir. 2004). To do so, an alien must establish either past persecution, or a well-founded fear of persecution upon return to the country of origin. *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005).

According to INS regulations, "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. §§ 208.13(a) & 208.16(b). The BIA has interpreted this regulation to mean that "where an alien's testimony is the only evidence available, it can suffice where [it] is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of the alien's alleged fear." *In re M-D-*, 1998 WL 127881, 21 I. & N. Dec. 1180, 1182 (BIA 1992) (citation omitted).

Nevertheless, the BIA has further stated that "where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided. . . . The absence of such corroborating evidence can lead to a finding that an applicant has failed to meet [his] burden of proof." *In re S-M-J-*, 1997 WL 80984, 21 I. & N. Dec. 722, 725-26 (BIA 1997). "Where the alien's testimony could be viewed as incredible, inconsistent, or incoherent, a fact-finder may reasonably conclude, absent corroboration, that the testimony is insufficient to meet the standard of proof required." *Sako v. Gonzales*, 434 F.3d 857, 862 (6th Cir. 2006) (citation omitted). This court has held that, even if an applicant's credibility is not in question, the failure to provide reasonably available corroborating evidence "can lead to a finding that an applicant has failed to meet [his] burden of proof." *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004) (internal quotation marks and citation omitted); *see Shkabari v. Gonzales*, 427 F.3d

324, 331 (6th Cir. 2005) (holding that applicant failed to meet refugee burden where record included evidence that she could have obtained documents confirming her hospital visit after allegedly being beaten by police, or other medical evidence, but failed to do so).

Niang submits that his testimony was sufficiently specific and detailed to satisfy his burden of proof pursuant to 8 C.F.R. § 208.13(a). Specifically, Niang testified that he was arbitrarily detained for more than two months, security forces attempted to force him to leave his political party and join theirs, and he was imprisoned at a military camp, beaten, and warned to avoid political demonstrations and rallies. In addition to his testimony, Niang produced a witness who corroborated that Niang was arrested because of his political affiliation with the AC. Further, Niang produced the corroborative 2002 Department of State Country Reports that highlights the Mauritanian government's poor human rights record and states "the Government banned the Action for Change (AC) party, claiming it incited racism and violence and attempted to disrupt national unity. . . [.]"

The IJ found that the above evidence did not sustain Niang's burden of proof. Specifically, the IJ faulted Niang for his failure to produce an AC party card or other documentation of his membership and criticized his failure to provide any documents evidencing his wife's refugee status in Senegal, despite his roommate's (and witness) visit to Niang's family a month prior to the hearing. Finally, the IJ characterized Niang's account of the January 2002 soccer stadium arrest as "generally skimpy, generalized, meager, and . . . lacking in specificity . . . ." We disagree.

The Second Circuit has rendered a decision on similar facts that we find instructive. *See Diallo v. I.N.S.*, 232 F.3d 279, 288-89 (2d Cir. 2000). In *Diallo*, the BIA had held that the

-10-

Mauritanian applicant should reasonably have been able to provide the following documentary evidence: (1) proof of his Mauritanian citizenship; (2) letters or affidavits from his sister, who lived in Senegal outside a refugee camp and had been in contact with the applicant since his arrival in the United States; (3) letters or affidavits from other family members to corroborate his claim that he was arrested and detained by authorities while his family was expelled from Mauritania; and (4) confirmation of his family's presence or registration at a refugee camp in Senegal. *Id.* On review, the Second Circuit reversed and remanded, holding that the BIA did not articulate why it was reasonable to expect the petitioner to provide such materials. *Id.* at 286. Notably, the court highlighted that these materials were not easily accessible to the petitioner given his functional illiteracy, his relatively hurried departure from Mauritania, and his various explanations for not supplying the requested documents. The *Diallo* court also noted that the BIA failed to assess the applicant's proffered explanations, and, as a result, the court was unable to ascertain whether the BIA or the IJ credited these explanations which, it appeared to the court, were at least facially reasonable. *Id.* at 289.

The instant case has numerous parallels to *Diallo*. Here, the IJ faulted Niang for failing to produce an AC party card or other documentation of his membership. In response, Niang proffered that the AC was planning to give him a membership card, but his arrest occurred first. In the short order denying Niang's petition, the IJ did not address this explanation. Additionally, the IJ criticized Niang's failure to provide any documents evidencing his wife's refugee status in Senegal, despite his roommate's (and witness) visit to Niang's family a month prior to the hearing. Niang testified

that his wife had documentation of her refugee status with her in Senegal. Nevertheless, the IJ made no findings as to why documentation was lacking from Niang's wife, nor whether either Niang or his wife was functionally literate.

Finally, the IJ found that Niang's account of the soccer stadium arrest was not credible because it lacked specificity and detail. We disagree. As Niang summarizes in his reply brief, he testified in detail regarding his soccer stadium arrest. The specifics included that the soccer stadium was in midtown, Ibrahim Star gave a speech, the arrest was by the Black Moors, and the officers arrived in trucks and wore khaki uniforms. Further, Niang provided specific details regarding his incarceration and arrest.

In summary, if the BIA insists on further corroboration, it must explain in its decision (1) why it is reasonable under its standards to expect such corroboration in this case; and (2) why Niang's explanations for lack of corroboration are insufficient. *Diallo*, 232 F.3d at 290.

IV.

For these reasons, we grant the petition for review, vacate the BIA's order, and remand for further proceedings consistent with this opinion.