NOT FOR FULL-TEXT PUBLICATION
File Name: 09a0478n.06

NO. 08-4089

**FILED**

JUL 9, 2009

LEONARD GREEN, Clerk

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SERGEY FISENKO,        (
       (
       *Petitioner,*        (
       (     On Petition for Review of an Order of
       (     the  Board of Immigration Appeals.
       (
       (     **OPINION**
ERIC H. HOLDER, Jr.,        (
Attorney General[*]        (
       (
       (
       *Respondent.*        (

_____ /

**BEFORE: COLE and ROGERS, Circuit Judges; and GRAHAM, Senior District Judge.[**]**

       **GRAHAM, Senior District Judge.** Petitioner Sergey Fisenko (Mr. Fisenko) seeks review of a final order of the Board of Immigration Appeals (BIA or Board) adopting and affirming the decision of the Immigration Judge denying Mr. Fisenko's application for asylum and withholding of removal. Mr. Fisenko argues that the BIA erred when it affirmed the Immigration Judge's decision because the Immigration Judge made an unreasonable demand for corroboration and because the Immigration Judge's decision was not supported by substantial evidence. For the following reasons, we DENY the petition for review.

_____

       [*]Substituted for Michael B. Mukasey pursuant to Federal Rule of Appellate Procedure 43(c)(2).

       [**]The Honorable James L. Graham, United States Senior District Judge for the Southern District of Ohio, sitting by designation.

# I. BACKGROUND

Mr. Fisenko claims to have suffered persecution on account of his Baptist faith at the hands of the Russian Cossacks and the Russian police. According to various internet articles Mr. Fisenko submitted into the record, Cossack origins have been traced back to the 18th Century. The Cossacks were elite members of society who were eventually incorporated into the hierarchy of the Russian state as scouts, border guards, and mercenaries. Today, Cossack values include "[a]n unyielding commitment to the country's territorial integrity, a forceful stance against adversaries, and the promotion of traditional values. . . . Russian ethnicity and Orthodoxy are crucial to Cossack identity." Joint Appendix, 151, 153 hereinafter "J.A."  During the hearing before the Immigration Judge, Mr. Fisenko introduced a video called "Death of a Nation." The Immigration Judge stated that this video indicated that Cossacks in some parts of Russia view themselves as protectors of traditional Russia and serve in some parts of Russia as a "parallel police force with armed people in their ranks and under their control." J.A. 67.

In November 2005, after Mr. Fisenko left for the United States, the State Duma passed a law which officially recognized the recruitment of Russian Cossacks into state service in police, military and border guard forces.  The law confirmed the effective coordination between regional authorities and Cossack organizations. According to one article in the record, in southern Russia, "Cossack paramilitary units have figured prominently in violent campaigns to persecute and expel ethnic minorities and illegal immigrants -- often with tacit official approval." J.A. 157.

Mr. Fisenko was born in Krasnador, Russia. He was raised as an atheist but later converted to the Baptist faith in 2003. After converting, he discussed his newfound faith with his neighbors and coworkers.  People began mocking him for being different and calling him a "sectant." Mr. Fisenko bases his claim of past persecution on the following six incidents.

In November 2003, as he was coming home from work, Mr. Fisenko's neighbors began beating him, threatening to kill him, and threatening to slit his throat. He managed to make it safely inside his house and lock the door. Mr. Fisenko did not file a police report after this first incident.

2

In December 2003 Mr. Fisenko was stopped by three drunk Cossacks on patrol while he was coming home late from an evening worship service. They held him by his clothes and demanded to see his identification, even though they knew who he was. Mr. Fisenko recognized one of the Cossacks as "Ottoman." He tried to escape but the patrolmen held him and started beating him and he fell. Once on the ground, the Cossacks beat him and he lost his orientation. They swore at him, calling him a Baptist and other "bad words." J.A. 79. The Cossacks then handcuffed him and pushed him into their car. They took him to Cossack headquarters and told him they were going to take him to the police station and tell the police he was not obedient to authorities. They spilled vodka on him. A sober Cossack who was at the headquarters when Mr. Fisenko arrived took Mr. Fisenko to the hospital and told the staff that he had found Mr. Fisenko in this condition on the street. Mr. Fisenko was treated for a brain concussion and kidney hematoma and released.

Mr. Fisenko filed a police report and the police sent him to the forensics department to examine him. According to the police report, the Cossacks had familiarized themselves with a list of wanted criminals prior to beginning their foot patrol that night. When they met Mr. Fisenko in the street and he did not produce identification, they believed that he met the description of one of these wanted criminals. They asked Mr. Fisenko to go to Cossack headquarters, but Mr. Fisenko refused and, assuming he was a wanted criminal, they attempted to capture him and drag him to the Cossack headquarters. Mr. Fisenko tried to flee and the Cossacks subdued him using physical force. According to the report, it was only later after Mr. Fisenko provided the Cossacks with an alibi for the crime of which he was suspected that the Cossacks let him go and took him to the hospital. The police report concluded that after the investigation no criminal charges should be filed against the Cossacks because Mr. Fisenko's injuries were inflicted due to his resistance of lawful demands and the handcuffs were placed on him for less than two hours and only for transportation to Cossack headquarters.

In February 2004 as Mr. Fisenko was crossing the street, a car stopped, a Cossack got out, hit Mr. Fisenko, and called him a Baptist and "dirty words." J.A. 80. The man then got back into

3

his car and drove away. Again, Mr. Fisenko filed a police report and the police sent him to the forensics department for examination. The police report indicates there was one witness to the assault. The police ran the car model and the partial plate number, but found no cars that matched that registration. The police report indicates that in order to identify the attacker, Mr. Fisenko was shown pictures of Cossacks in the district but he was not able to identify anyone.

After the February 2004 incident and on an unknown date, two children threw bricks through Mr. Fisenko's front and rear windshields. One of the children was the son of Ottoman, the Cossack from the December 2003 incident involving the three drunk Cossacks. Mr. Fisenko reported this incident to the police and the police investigated. The police report stated that the son of Ottoman admitted that he wanted to create trouble for the "sectarian." J.A. 405. The police report stated that in accordance with Russian law, the police could not charge the boys because they were not at least 14 years of age. The police, however, placed the boys on a watch list called the "Department of Crime Prevention of Minors" that identified minors who were prone to committing felonies. J.A. 405. The police report indicated Mr. Fisenko could seek material damages through a civil action, but Mr. Fisenko declined to do so.

After Mr. Fisenko acquired another car and on an unidentified date, the car was either set or caught on fire while parked outside Mr. Fisenko's property. Mr. Fisenko did not see anyone set fire to his car and does not know who was responsible. He called the police and the fire department and they told him that the "Cossacks said that they [were] going to make sure that all Baptists [were] going to move out of that area." J.A. 85. The police report stated that the car was a 1974 model and the fire was probably caused by a short circuit of the electrical wiring of the car due to the way the car burned from the inside out. The police based their opinion on the fact that the car was 30 years old, that it lacked circuit breakers, and that halogen lights not intended by the manufacturer were installed in the car. Mr. Fisenko does not believe this explanation because he has experience as a mechanic.

In June 2004 Mr. Fisenko came home to find his dog hanged, the windows to his house broken, and "gasoline set in the house." J.A. 86. He called the police and they took him to the police station. The police put Mr. Fisenko in a cell and kept him there for two days without food or water. They interrogated him and asked him about his prayer house, where it was located, how many members it had, and whether Mr. Fisenko could identify who was assaulting him. Among the policemen were Cossacks. The police beat Mr. Fisenko and continuously put him under water saying it was a "Baptismal procedure." J.A. 87. They told Mr. Fisenko that if he did not move out of the area, he would be hanged like his dog. Mr. Fisenko did not file a police report because it was the police who were assaulting him. Two and a half months after this incident, Mr. Fisenko left for the United States.

Two days before Mr. Fisenko's authorization to remain in the United States ran out, Mr. Fisenko filed an application for asylum, withholding of removal, and protection under the regulations implementing the Convention Against Torture ("CAT")[1] with the Department of Homeland Security ("DHS"). DHS initiated removal proceedings charging Mr. Fisenko under 8 U.S.C. § 1227(a)(1)(B) as an alien who remained in the United States for a time longer than permitted. On October 24, 2006, Mr. Fisenko testified in support of his application in front of an Immigration Judge.

## A.    The Immigration Judge's Decision

The Immigration Judge, conducting the proceeding through video conference in Cincinnati, Ohio, denied Mr. Fisenko's application for asylum and withholding of removal. The Immigration Judge found Mr. Fisenko to be a "generally credible witness" whose testimony was "fairly detailed, plausible, largely internally consistent and generally consistent with the asylum application and statement that he filed." J.A. 16. The Immigration Judge nevertheless found Mr. Fisenko did not meet his burden of proving past persecution.

---

[1]Mr. Fisenko does not argue in his opening brief that he is entitled to relief under the CAT, and therefore this argument is waived.

The Immigration Judge found that Mr. Fisenko did not corroborate key parts of his story. Significantly, he did not corroborate his last incident of abuse occurring in June 2004 with statements from his family members in Russia, despite acknowledging that his mother, sister, and grandmother knew about the incident. Further, although he produced evidence from his pastor here in the United States who confirmed he was a practicing Baptist, he did not produce any corroboration for his conversion to the Baptist faith in Russia or his practice of that faith in Russia, despite acknowledging that he still kept in contact with his co-parishioners and fellow Baptists in Russia.

As to the other instances that were corroborated, the Immigration Judge found that they were not undertaken by individuals the government was unable or unwilling to control because the police investigated each time Mr. Fisenko complained and they took their investigation seriously. The Immigration Judge also found that the first five instances were not severe enough to rise to the level of persecution.

The Immigration Judge found Mr. Fisenko failed to meet his burden of showing a well-founded fear of future persecution because although there was evidence in the record that the Cossacks are responsible for some abuses against minority religions, there was also evidence suggesting Baptists in present-day Russia are not persecuted by the government or by any other persons the government is unable or unwilling to control and Mr. Fisenko did not show it would be unreasonable for him to relocate somewhere in Russia where he could avoid problems and practice his faith.

**B.      The BIA's Decision**

The BIA adopted and affirmed the decision of the Immigration Judge denying relief to Mr. Fisenko. The Board added the following statement: "We agree that under the law of the Sixth Circuit . . . the failure to present evidence corroborating the respondent's conversion and membership in the Baptist church in Russia is sufficient to support the Immigration Judge's finding that the respondent did not meet his burden of proof, even where the respondent's testimony is credible." J.A.1.

6

## II. ANALYSIS

### A.    Standard of Review

Where the Board adopts and affirms the decision of the immigration judge and provides a supplementary comment, this court reviews "the decision of the [immigration judge] while considering the additional comment made by the [Board]." *See Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005)(per curium). The United States Supreme Court has held that an immigration judge's determination regarding asylum eligibility must be upheld if "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)(quoting 8 U.S.C. § 1105a(a)(4)) (repealed and replaced by 8 U.S.C. § 1252(b)(4)(B))).[2] To reverse such a finding, the evidence must "not only support[] [the opposite] conclusion, but compel[] it." *Id.* at n.1 (emphasis omitted). "[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).  Questions of law are reviewed de novo. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004).


### B.    Eligibility for Asylum

Asylum analysis involves a two-step inquiry: (1) whether the applicant qualifies as a "refugee" as defined in 8 U.S.C. § 1101(a)(42)(A), and (2) whether the applicant merits favorable exercise of discretion by the immigration judge. *Patel v. Alberto Gonzales*, 470 F.3d 216, 218 (6th Cir. 2006). Mr. Fisenko has the burden to demonstrate he qualifies as a "refugee." 8 C.F.R. 1208.13(a). The term "refugee" means a person who is unable or unwilling to return to his or her country because of "persecution or a well-founded fear of persecution on account of race, religion,

---

[2]In articulating the "substantial evidence" standard, the Supreme Court quoted directly from 8 U.S.C. § 1105a(a)(4), which has subsequently been repealed and replaced by 8 U.S.C. § 1252(b)(4)(B). Although articulated differently, "'§ 1252(b)(4)(B) basically codifies the Supreme Court's substantial evidence standard.'" *Akhtar v. Gonzales*, 406 F.3d 399, 404 (6th Cir. 2005)(quoting *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004)).

7

nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Under that definition, therefore, Mr. Fisenko must show that he was either persecuted in the past on the basis of his Baptist faith or has a "well-founded fear" of persecution in the future. If Mr. Fisenko can establish past persecution, it is presumed that he has a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1).

### 1. Past Persecution

If the government itself is not responsible for persecution, it must be unable or unwilling to control the people responsible in order for the applicant to be entitled to asylum. *See Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004)(citing *Matter of Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996)); *Khalili v. Holder*, 557 F.3d 429, 436 (6th Cir. 2009)(upholding the BIA denial of withholding of removal because there was substantial evidence that those inflicting harm were not individuals the government was unable or unwilling to control); *Raza v. Gonzales*, 484 F.3d 125, 129 (1st Cir. 2007) ("When an asylum claim focuses on non-governmental conduct, its fate depends on some showing either that the alleged persecutors are aligned with the government or that the government is unwilling or unable to control them."). *See also El Ghorbi v. Mukasey*, 281 F. App'x 514, 517 (6th Cir. 2008) (unpublished) (finding no eligibility for asylum or withholding of removal where petitioner could not establish that he was harmed by persons the government was unwilling or unable to control); *Kere v. Gonzales*, 252 F. App'x 708, 713 (6th Cir. 2007) (unpublished)(determining that no persecution exists where family members abused applicant because there was no evidence that the government was unable or unwilling to control the family members' conduct and protect the applicant). Of the six incidents relied on by Mr. Fisenko, only the final incident involved harm inflicted by the government itself, and the Immigration Judge did not consider this incident because Mr. Fisenko did not corroborate it. As to the other five incidents, the Immigration Judge found that they were investigated by the police and the police took that investigation seriously, such that it could not be said that the government was unable or unwilling

8

to control the Cossacks. The first incident that involved Mr. Fisenko's neighbors was never reported to the police. As a result, Mr. Fisenko did not demonstrate that the police would have refused to or been unable to investigate or prosecute his neighbors. The remaining four incidents were reported and on each occasion the police investigated. The police report for the incident involving the three drunk Cossacks in December 2003 indicates that the police did not prosecute them because the investigation revealed that the Cossacks "lack[ed] criminal intent" – namely, that they abused Mr. Fisenko because he resembled a "wanted criminal for burglary," lacked his identification papers to establish that he was not the wanted criminal, and attempted to run away from them. The police report for the incident in February 2004 involving the Cossack who got out of his car and hit Mr. Fisenko indicates that the police investigated the abuse, questioned the only witness, attempted to identify the owner of the car, and showed Mr. Fisenko pictures of known Cossacks in order to identify the assailant. Mr. Fisenko was unable to identify his assailant, and thus, the police were unable to locate him. The police report for the incident involving the two boys who broke Mr. Fisenko's windshield similarly establishes that the police questioned witnesses, and after discovering the identity of the two boys, put their names on the "list of the Department of Crime Prevention of Minors . . . as subjects who are prone to committing felonies." Finally, the police report for the incident during which Mr. Fisenko's car burned indicates that the police investigated the cause of the fire and determined that it was not arson but rather "the short circuit of the electric wiring of the control panel" of his thirty-year old car.

Mr. Fisenko claims that the police reports were merely a cover up for the police officer's unwillingness to investigate his case, but Mr. Fisenko offered no evidence to support this claim and no reason to believe the police were involved in the Cossacks' abuse. Given the efforts by the police and forensic departments, this court is not compelled to reach a conclusion different from the Immigration Judge or to say that the abuses suffered by Mr. Fisenko were at the hands of individuals the government is unable or unwilling to control. Thus, this leaves only the last incident for our

9

consideration- the incident involving Mr. Fisenko being detained for two days by the police. The Immigration Judge did not consider this incident because Mr. Fisenko failed to corroborate it.

While it is true that the testimony of the applicant alone if credible may be sufficient to sustain the burden of proof without corroboration, where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided. *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004); 8 C.F.R. §§ 208.13(a); 208.16(b). "The absence of such corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof." *Dorosh*, 398 F.3d at 382, quoting *In re S-M-J*, 21 I. & N. Dec. 722, 724-26 (BIA 1997); *see also Abdulai v. Ashcroft*, 239 F.3d 542, 553 (3rd Cir. 2001)(holding failure to provide such evidence without adequate explanation can support a finding that the applicant failed to meet his burden of proof). This corroboration rule can be applied even in cases where the testimony of the applicant is deemed credible. *Dorosh*, 398 F.3d at 382. *See also Abdulai,* 239 F.3d at 554 (upholding the Board's requirement that "otherwise-credible applicants . . . supply corroborating evidence in order to meet their burden of proof"). A reviewing court may not reverse an agency finding as to the availability of corroborating evidence unless the court finds a reasonable trier of fact would be compelled to conclude that such evidence is unavailable. 8 U.S.C. § 1252(b)(4).[3]

The Immigration Judge determined that Mr. Fisenko's testimony by itself did not meet his burden of proof because he failed to corroborate the final incident of alleged persecution that took place in June 2004, even though he testified his mother, sister, and grandmother knew about the incident. *See Dorosh*, 398 F.3d at 383 (noting it was reasonable to expect corroboration where

---

[3]This rule applies to the instant case, as it is applicable to all cases in which the "final administrative removal order is or was issued before, on, or after the date of the enactment of the REAL ID Act- May 11, 2005. See Real ID Act of 2005, § 101(h)(3), Pub.L. No. 109-13, 119 Stat. 231, 305-306. However, other provisions of the Immigration and Nationality Act that were amended by the REAL ID Act do not apply to this case because those changes apply only prospectively to applications for asylum made on or after May 11, 2005. See REAL ID Act § 101(h)(2). Mr. Fisenko's application for relief was filed on March 23, 2005.

petitioner was in contact with her mother in the Ukraine yet produced no affidavit from her mother corroborating the ill treatment of her daughter). When the Immigration Judge asked Mr. Fisenko why he failed to provide letters from his family members corroborating this last incident, Mr. Fisenko responded " I, I didn't know that I could get those letters, and they could be helpful. I'm also scared, and, I fear for their lives. So, I, I told them not to talk about me much." J.A. 100. The Immigration Judge implicitly rejected Mr. Fisenko's given reason when he stated in his oral opinion:

> There appears to me to have been reasonably available corroboration, which was not produced. Respondent admitted that there are people in Russia who know about the incident or who he says know about the incident. He named specifically certain family members, including his mother. Yet, he did not provide any statements from any people who had knowledge of this incident. No one corroborate[d] his claim. The incident is serious because this is really the only one that involves the police authorities of Russia themselves rather than Cossacks or private individuals. And yet, he provided no statement or affidavit or letter or live witness of any persons who could corroborate it.

J.A.20.

The Second and Third Circuits use a three-part test for analyzing corroboration. *See Diallo v. INS*, 232 F.3d 279, 290 (2d Cir. 2000); *Abdulai*, 239 F.3d at 554. The test requires that the Immigration Judge to (1) identify the facts for which "it is reasonable to expect corroboration; (2) [make] an inquiry as to whether the applicant has provided information corroborating the relevant facts, and if he or she has not, (3) [analyze] whether the applicant has adequately explained his or her failure to do so." *Abdulai*, 239 F.3d at 554, quoting in part *In re S-M-J*, 21 I. & N. Dec. 722, 724-26 (BIA 1997). Mr. Fisenko argues the Immigration Judge did not comply with this test because he did not analyze why Mr. Fisenko's explanation that he feared for his family was inadequate. The Sixth Circuit has yet to formally adopt all three parts of this test in any published decision, but we have indicated support for the test in at least one unpublished case. *See Niang v. Gonzeles*, 195 F. App'x 371, 377 (6th Cir. 2006)(unpublished). Mr. Fisenko argues that the Sixth Circuit has adopted this test because *Dorosh* cited *Diallo* and *Abdulai*, *supra*, when indicating we agreed with their approach that corroboration should be provided where reasonably available. But *Dorosh* did not

explicitly adopt the three-part test from these cases nor did it adopt a requirement that the Immigration Judge specifically address on the record why an applicant's explanation is insufficient, and Mr. Fisenko points this court to no published Sixth Circuit case law that does.

We decline to adopt the test from the Second and Third Circuits in this case because the policy behind the test, clarity for purposes of judicial review, is not furthered by applying the test here. In *Diallo*, petitioner stated he could not corroborate his story because his identity papers were destroyed, he received only one hand-delivered letter from his sister since he arrived in the United States, he had not been able to communicate directly with his family, and he lost his refugee camp identity card during his travels. 232 F.3d at 289. The immigration judge in *Diallo*, after being given such concrete reasons why the applicant could not provide the requested corroboration, failed to address why these reasons were insufficient. The court noted that because no assessment was made of the petitioner's reasons why he failed to produce the corroboration, the court could not know whether the BIA or the IJ credited his explanations, which at least facially, appeared reasonable. *Diallo*, 232 F.3d at 289. Because the applicant listed multiple reasons for his failure to corroborate his evidence, the Second Circuit could not determine for purposes of appellate review on what basis the immigration judge found the applicant's testimony insufficient where the immigration judge did not explain his reasons. In *Abdulai* the record was even less clear as the BIA never explained what aspects of Abdulai's testimony should have been corroborated or whether Abdulai ever adequately explained his inability to do so. As in *Diallo*, the court noted that without mentioning what particular aspects of the applicant's testimony it would have been reasonable to expect him to corroborate and without an explanation about his inability to do so, the court could not effectively review the case. *Abdulai*, 239 F.3d at 554 . The court expounded on its reasoning by stating:

> We acknowledge that our standard of review is extraordinarily deferential to the BIA, and that nothing in the INA specifically requires the Board to explain its decisions. But the availability of judicial review (which is specifically provided in the INA) necessarily contemplates *something* for us to review. In a case quite similar to this one, the Second Circuit vacated and remanded a decision by the BIA so that the Board could further explain its reasoning. *See Diallo v. INS*, 232 F.3d 279, 288-90

12

(2d Cir. 2000). We have done the same when deficiencies in BIA decisions have made them impossible to review meaningfully. *See, e.g., Sotto v. USINS*, 748 F.2d 832, 837 (3d Cir. 1984). Because the BIA's failure of explanation makes it impossible for us to review its rationale, we grant Abdulai's petition for review, vacate the Board's order, and remand the matter to it for further proceedings consistent with this opinion.

*Id*. at 555 (emphasis in original).

Here, the Immigration Judge asked Mr. Fisenko why he did not provide the corroborative evidence, and Mr. Fisenko testified he feared for his family. Because Mr. Fisenko testified to only one reason on the record and gave no further testimony that would make this fear reasonable, it is clear why the Immigration Judge rejected it.[4] Mr. Fisenko gave no testimony that would indicate his sisters, mother, or grandmother were in any kind of danger simply by being related to Mr. Fisenko or that they were targets of any threats themselves. Nor did he explain why he feared that they would be harmed for statements made in private communications sent to him. In *Dorosh*, petitioner argued that getting corroboration from her mother would have jeopardized her mother's safety. 398 F.3d at 383. But the Court found that despite petitioner's fears, she could have requested a letter "in a manner that minimized any risk of sensitive statements being overheard." *Id.* Because Mr. Fisenko gave only one reason without any additional support for his lack of corroboration, it is clear for purposes of review why that reason was implicitly rejected by the Immigration Judge. Thus, the policy of having a clear record for judicial review is not jeopardized in this case and it is not an appropriate case in which to adopt the three part reasoning from the Second and Third Circuits. Under Sixth Circuit case law, the immigration judge's conclusion that Mr. Fisenko could have reasonably corroborated the last and most serious incident occurring in June 2004 is sufficient, and this court is not compelled to conclude that such corroboration was unavailable so as to warrant reversing the Immigration Judge's findings. See 8 U.S.C. § 1252(b)(4).

---

[4]Mr. Fisenko's comment that he did not know that information could be helpful is not sufficient to show that the evidence is unavailable.

Mr. Fisenko also argues that any affidavits from his family detailing the June 2004 incident would have been inadmissible hearsay. But immigration proceedings are not governed by the Federal Rules of Evidence, *see Singh v. Ashcroft*, 398 F.3d 396, 406-407 (6th Cir. 2005), and this court has found hearsay evidence is admissible as corroborating evidence in immigration proceedings. *See Keita v. Gonzales*, 175 F. App'x. 711, 713 (6th Cir. 2006) (unpublished). *See also Kasa v. Gonzales*, 128 F. App'x 435, 441 (6th Cir. 2005).

This court is bound by the REAL ID Act of 2005 and may not reverse an agency finding as to the availability of corroborating evidence "unless the court finds. . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4) (as amended by The Real ID Act of 2005). Given that Mr. Fisenko could have obtained corroboration for this last incident, this court is not compelled to conclude that corroboration was unavailable. The fact that he did not corroborate his evidence of the June 2004 incident takes that incident out of consideration when determining whether Mr. Fisenko's abuse was at the hands of individuals the government was unable or unwilling to control. As to the other five instances, the Immigration Judge reasonably concluded that Mr. Fisenko failed to demonstrate that the individuals who carried out these abuses were individuals the government was unable or unwilling to control.

Because Mr. Fisenko cannot demonstrate the abuse he experienced in Russia at the hands of the Cossacks was abuse undertaken by those the government was unable or unwilling to control, his claim that he suffered past persecution fails. Thus this court need not analyze the other two grounds relied on by the Immigration Judge- that the abuse was not severe enough to rise to the level of persecution and that Mr. Fisenko failed to show his abuse was on account of his Baptist faith.

### 2. *Well-founded Fear*

Even if Mr. Fisenko does not demonstrate that he was persecuted in the past, he can still prevail on his claim for asylum if he can show he has a well-founded fear of persecution in the

future.[5] Because Mr. Fisenko did not carry his burden of demonstrating past persecution, he is not entitled to a presumption that he has such a fear. Instead, Mr. Fisenko must demonstrate he has a well-founded fear by showing: (1) he has a fear of persecution in his country of nationality on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) he is unable or unwilling to return to, or avail himself of, the protection of that country because of such fear. 8 C.F.R. 208.13(b)(2)(i). The Immigration Judge's decision turns on the second prong - whether there was a reasonable possibility of suffering persecution upon return to Russia.

### a. Objective Fear

A well-founded fear of persecution has both a subjective and objective component. The asylum applicant must actually fear he will be persecuted upon return to his country and he must establish that an objective situation exists under which his fear can be deemed reasonable. Ali v. Ashcroft, 366 F.3d 407, 410-11 (6th Cir. 2004). "'[T]he objective component requires the applicant to prove that either (a) there is a reasonable probability that he or she will be singled out individually for persecution, 8 C.F.R. § 208.13(b)(2)(i); or that (b) there is a pattern or practice of persecution of an identifiable group, to which the alien demonstrates he belongs, such that the alien's fear is reasonable.[6] 8 C.F.R. § 208.13(b)(2)(iii).'" *Akhtar v. Gonzales*, 406 F.3d 399, 404 (6th Cir.

---

[5]Respondent argues that Mr. Fisenko waived this argument in his opening brief because he does not challenge that his fear was objectively reasonable or that it would be unreasonable for him to relocate in Russia. In fact, Mr. Fisenko discusses the reasons he believes his fear was well-founded, including his past abuse and country conditions on the record. Mr. Fisenko also argues that it is the Government's burden to demonstrate relocation is reasonable. Thus, Mr. Fisenko did not waive these arguments.

[6]Respondent argues that Mr. Fisenko failed to exhaust his argument that Mr. Fisenko's fear is well-founded because there is a "pattern or practice" of persecution of Baptists in Russia. *See Ramani v. Ashcroft*, 378 F.3d 554, 559-60 (6th Cir. 2004)(discussing failure to exhaust); 8 C.F.R. § 1208.13(b)(2)(iii)(A)(pattern and practice standard). While there may be some support for Respondent's position because Mr. Fisenko did not use the words "pattern or practice" in his brief to the BIA, regardless of whether this claim was exhausted, Mr. Fisenko has not shown a pattern and practice of persecution exists for the reasons discussed above.

15

2005)(quoting *Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004) (internal citation omitted)).

The term "well-founded fear" can only be given concrete meaning through case-by-case adjudication. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987). In order to show a well-founded fear of persecution, the applicant does not need show that he probably will be persecuted if he is deported; "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Id.* at 431. The Supreme Court has stated that even a showing of a ten percent likelihood of persecution in some situations could suffice to establish that an applicant's fear is well-founded. *See id.* (citing a "leading authority" for the proposition that where every tenth adult male person is either put to death or sent to some remote labor camp it would be apparent that anyone who escaped from the country would have a "well-founded fear" of being persecuted upon return). *See also Castaneda-Hernandez v. Immigration & Naturalization Service*, 826 F.2d 1526, 1530 (6th Cir. 1987) (interpreting *Cardoza-Fonseca* as characterizing the lower threshold for asylum eligibility as even a 10% chance of persecution but also noting that the Supreme Court avoided a definitive attempt to define the phrase "well-founded fear").[7] Because a well-founded fear of persecution can be based on what has happened to others who are similarly situated, it is "necessary, in considering an applicant's asylum petition, to weigh evidence of general conditions in the country of origin and the foreign government's history of treatment of others engaged in similar activities." *Perkovic v. INS*, 33 F.3d 615, 621 (6th Cir. 1994). In order to reverse the Board's determination, this court would have to decide that the evidence compels a reasonable fact finder to conclude that there is a reasonable possibility that Mr. Fisenko

---

[7]Respondent argues that Mr. Fisenko failed to exhaust the argument that a ten percent showing would suffice to establish a well-founded fear. But Mr. Fisenko did argue he had a reasonably well-founded fear in his brief to the BIA and his citation to the fact that even a ten percent chance of persecution could support a well-founded fear standard only lends further support to his argument.

would suffer persecution if he were to return to Russia. 8 C.F.R. § 1208.13(b)(2)(B); *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998).

While the Immigration Judge acknowledged that there was "significant information in the record" to establish that the Cossacks were responsible for some abuses against practitioners of minority religions in Russia, he did not find the information on the record supported that any of these abuses amounted to persecution carried out by people the government was unwilling or unable to control. For example, the United States Department of State Country Report on Human Rights Practices for Russia for 2005 ("2005 Country Report"), and the United States Department of State International Religious Freedom Report for Russia for 2005 ("2005 Religious Freedom Report") indicate incidents of harassment and violence against religious minorities, including the bombing of two unregistered Baptist churches in 2004, and one registered Baptist church in 2005. While the reports indicate no progress was made in the investigation of these explosions, the reports do not indicate that such abuse was at the hands of the government or that the reason for the lack of progress was the government's inability or unwillingness to control the perpetrators. The fact that these incidents occurred does not demonstrate that the government is unable or unwilling to control the perpetrators of these, or similar, incidents. The 2005 Country Report states that the "authorities usually investigated incidents of religious vandalism and violence." J.A. 182. Although the Report further states that "arrest of suspects were extremely infrequent and convictions rare "(J.A. 182), the report does not indicate that the reason for the low arrest, prosecution, or conviction rates was because the government was unable or unwilling to control the perpetrators.

As to acts carried out by the government itself, Mr. Fisenko argues that one Baptist minister was prevented from returning to Russia (although the report does not indicate why), a Baptist community was prevented from renting the premises at a public library since 2003, and a rebuilding permit for one Baptist church was denied by the government (although the church was eventually rebuilt and services held there without interruption). Mr. Fisenko also argues that a 1997 law targets minority religions by making it difficult for members of less well-established religions to set up

17

religious organizations; and grants rights such as opening a bank account and owning property to religious groups who are registered, while members of unregistered groups do not have these same rights. While unfortunate, these examples of discrimination against minority religions and this 1997 law are not examples of persecution such that they would support Mr. Fisenko's well-founded fear. "Persecution" within the meaning of 8 U.S.C. § 1101(a)(42)(A) "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch*, 146 F.3d at 390. It is clear, no doubt, that there may be some tension between minority religions and the government of Russia, but this court is not compelled to conclude based on the evidence in the record that such tensions amount to persecution sufficient to support Mr. Fisenko's well-founded fear of future persecution.

Noticeably absent from either report is any significant mention of the Russian Cossacks. Instead, Mr. Fisenko has submitted articles detailing the Cossack's role in the Russian government and their reputations as fierce nationals. According to one article in the record, in southern Russia, "Cossack paramilitary units have figured prominently in violent campaigns to persecute and expel ethnic minorities and illegal immigrants -- often with tacit official approval." J.A. 157. Although characterizing Cossacks as violent and such violence as receiving "tacit official approval," this statement still does not say that Cossacks target religious minorities in general or Baptists in particular. Instead, it refers to "ethnic minorities and illegal immigrants."

The record in this case indicates that the Russian government supports the Cossacks in general and that they have now been officially recognized by the government, but the record does not demonstrate that the government supports Cossacks who abuse religious minorities or that the government refuses to investigate allegations of Cossack criminal behavior. The 2005 Country Report and the 2005 Religious Freedom Report do not make any mention of incidents in which the Cossacks engaged in violence against religious minorities. The 2005 International Religious Freedom Report states that "[t]he Constitution provides for freedom of religion, and the Government generally respects this right in practice, however, in some cases the authorities imposed restrictions

18

on certain groups. Although the Constitution provides for the equality of all religions before the law and the separation of church and state, the Government did not always respect these provisions." J.A. 245. "[The] government policy continued to contribute to the generally free practice of religion for most of the population." J.A. 244. Given these conditions in Russia, this court is not compelled to conclude Mr. Fisenko has a well-founded fear of persecution.

Mr. Fisenko argues that his production of one witness, Natalaya Shetsova, compels the conclusion that he has a well-founded fear of future persecution. Ms. Shetsova was granted asylum in the United States after fleeing Krasnador, Russia with her parents in 1997. Ms. Shetsova's affidavit states she and her family were persecuted on account of her Baptist religion in Russia. Apart from the fact that Mr. Fisenko and Ms. Shetsova are both Baptists from Krasnador, they seem to have little else in common. Ms. Shetsova's affidavit makes no mention of the Cossacks, nor does it name her aggressors. Moreover, the affidavit does not explain the reasons that Ms. Shetsova was granted asylum.

### b. Relocation

Mr. Fisenko will not be considered to have a well-founded fear of persecution if he could avoid persecution by relocating to another part of Russia if under all the circumstances it would be reasonable to expect him to do so. 8 C.F.R. § 208.13(b)(2)(ii). Where the applicant has established past persecution, it is presumed that internal relocation would not be reasonable and it is the Service's burden to show otherwise. See 8 C.F.R. § 208.13(b)(3)(ii). However, because Mr. Fisenko has not established past persecution, he has the burden of establishing that it is not reasonable for him to relocate. 8 C.F.R. § 208.13(b)(3)(i). Relying on the 2005 Country Report and the 2005 International Religious Freedom Report, the Immigration Judge concluded that Mr. Fisenko failed to demonstrate it was unreasonable for him to relocate within Russia without persecution. The only reason Mr. Fisenko gave for being unable to relocate within Russia is his opinion that the Cossacks "live all over Russia." J.A. 89. Mr. Fisenko's opinion that Cossacks "live all over Russia" is insufficient to demonstrate that it would not be reasonable for him to relocate within Russia. Even

19

the evidence submitted by Mr. Fisenko that details abuses by the Cossacks against ethnic minorities describes these acts as occurring in "southern" Russia. J.A. 157. The evidence does not mention such abuses by Cossacks in other areas of the country.

Mr. Fisenko has submitted a large amount of evidence that could lead this court to believe it would have decided the matter differently, but because this evidence does not compel a contrary conclusion, Mr. Fisenko's petition must be denied. Given that there is no clear evidence in the record that the Russian government supports or tolerates persecution of Baptists at the hands of the Russian Cossacks or anyone else and that there is no clear evidence in the record that Mr. Fisenko could not safely relocate to another part of the country, this court is not compelled to conclude that Mr. Fisenko has demonstrated a well-founded fear of future persecution. Thus, based on the facts before the Immigration Judge and the BIA, this court does not conclude that "any reasonable adjudicator would be compelled" to find a contrary result. 8 U.S.C. §1252(b)(4)(B); *see Yu*, 364 F.3d at 702.

## C.    Withholding of Removal

Mr. Fisenko also petitions for review of the administrative denial of his request for withholding of removal. Withholding of removal is mandatory if the alien establishes that his "life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *Pilica*, 388 F.3d at 951. Where an applicant seeks withholding of removal, he faces a burden that is more stringent than that required for a claim for asylum. *Khalili*, 557 F.3d at 435. He must demonstrate "that there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Singh*, 398 F.3d at 401 (quoting *Pilica*, 388 F.3d at 951). Because this burden is more stringent, Mr. Fisenko's failure to establish his eligibility for asylum likewise results in his failure to satisfy the more onerous burden for withholding of removal. *See, e.g., Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001) (per curium).

## III. CONCLUSION

Based on the foregoing reasons, this court DENIES Mr. Fisenko's petition for review.