**NOT RECOMMENDED FOR PUBLICATION**
File Name: 13a0671n.06

Nos. 12-3021, 12-4057

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jul 19, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| EKA AKHVLEDIANI, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| ZAKRO KBILASHVILI, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW OF |
| | ) | AN ORDER OF THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| ERIC H. HOLDER, JR., United States Attorney | ) | |
| General | ) | |
| | ) | |
| Respondent. | | |

Before:  SILER, CLAY, and GIBBONS, Circuit Judges.

**SILER**, Circuit Judge.  Eka Akhvlediani and Zakro Kbilashvili seek review of an order issued by an Immigration Judge ("IJ"), and affirmed by the Board of Immigration Appeals ("BIA"), denying their application for asylum and withholding of removal and their request for relief under the Convention Against Torture ("CAT").  They also seek review of the BIA's order denying their subsequent motion to reopen their applications.  Because the BIA's decisions are supported by substantial evidence and fall squarely within its broad discretion, we deny the petitions for review of both orders.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioners, husband and wife, are citizens of the country of Georgia. They currently reside in the United States and have two children who remain in Georgia. Kbilashvili began working as a policeman in 1993 in the Ministry of Internal Affairs. By 1995, he was promoted to inspector of the criminal department in Tbilisi, Georgia and later learned of some internal corruption whereby Ministry officials were collecting payments from local businessmen in exchange for taking no action regarding illegal sales. In 1998, he repeatedly called these businessmen and forbade them from giving any money to the police. As a result, Ministry superiors shunned him and he began receiving anonymous threatening phone calls. Kbilashvili was eventually asked to resign by his supervisor, but he refused.

Over the next several years, Petitioners claim to have been harassed, threatened, and attacked as a result of Kbilashvili's open opposition to governmental corruption. The tension perhaps climaxed when he was approached one day by a gunman, ordered out of his car, and shot in the hand. A few days later, Akhvlediani received an anonymous phone call warning her that "the second bullet w[ould] be the final for [Kbilashvili] and he w[ould] be killed." The shooting and related phone call convinced Kbilashvili to resign from his position, but he alleges that the threats persisted despite his withdrawal. Approximately six months after he resigned, he accepted a job as deputy director of a correctional facility in Rustavskaya. There, he battled narcotics smuggling and his wife again began receiving threatening phone calls.

By 2000, Akhvlediani was still receiving threatening phone calls from anonymous people who claimed to know where Petitioners lived and where their children went to school. Akhvlediani

claimed she was followed to and from school. Kbilashvili again requested to transfer jobs and was moved to a correctional facility in Tbilisi. He soon learned that criminals housed in the facility were paying managers to obtain contraband, special visitation rights, and drugs. He reported his finding and again received threatening anonymous phone calls. After another short relocation to Mayakovsky in 2002, during which Petitioners suspected they were being followed and heard gunshots near their new neighborhood, they left their two children in Georgia and traveled to the United States.

Petitioners were admitted to the United States in 2002 as non-immigrant tourist visitors with authorization to remain for six months. Since then, their two children have lived at all times with either their uncle or grandparent and have relocated frequently throughout Georgia. By late 2002, Petitioners decided to remain in the United States. At the advice of a friend, they traveled to Miami, Florida and met with an immigration consultant, Elmar Melikiganov, who indicated that Kbilashvili was eligible for a work visa. Petitioners believed Melikiganov to be an attorney and deposited a partial payment in cash for him to file the appropriate application on Kbilashvili's behalf. Several months later, Melikiganov called requesting additional payment but Kbilashvili refused because he had not received any documents or other evidence of Melikiganov's progress. Since then, Kbilashvili has been unable to contact Melikiganov.

In March 2003, an asylum application in Akhvlediani's name was filed with the Immigration and Naturalization Service. Four months later, the Department of Homeland Security initiated removal proceedings and served Petitioners with separate Notices to Appear ("NTAs"), charging them with being removable pursuant to Sections 237(a)(1)(B) of the Immigration and Nationality

Act, 8 U.S.C. § 1227(a)(1)(B). Petitioners claim they did not receive the NTAs and therefore failed to appear, resulting in their both being ordered removed *in absentia*.

In 2008, DHS officers detained Kbilashvili and he then learned that an I-589 application had been filed on his behalf. Through counsel, Petitioners moved to reopen their removal proceedings and rescind their *in absentia* removal orders as they claimed the I-589 application was a product of fraud. The IJ granted the motions and Petitioners subsequently admitted the factual allegations in the NTAs, conceded their removability, formally withdrew the March 2003 asylum application, and indicated that they each intended to apply for asylum, withholding of removal, and protection under the CAT. In 2009, they submitted these applications and request for relief. Although Petitioners each submitted separate applications, their claims for relief were essentially the same and were based on past threats and physical harm they faced in Georgia between 1997 and 2002, as well as threats to their family members since Petitioners arrived in the United States. They specifically claim that their son, Emzar Kbilashvili, has been physically attacked on more than one occasion as revenge for his father's activities. During one such attack in 2009, Emzar was beaten by several people and stabbed with a knife. He was attacked again later that year and was treated for multiple injuries to his face and body.

After multiple merits hearings, the IJ found Petitioners ineligible for asylum because their application was untimely and concluded they had not met their burdens of proving eligibility for withholding of removal or CAT protection because they failed to sufficiently corroborate their claims. The BIA affirmed the IJ's decision. Petitioners then filed a motion to reopen and submitted additional evidence of Emzar's 2009 attacks and evidence of a recent 2011 attack on their daughter,

Nino Kbilashvili. The BIA denied the motion after concluding that the 2009 evidence was not new or previously undiscoverable and that the evidence of Nino's attack failed to establish a requisite nexus between the harm suffered and a protected ground for relief.

## II. DISCUSSION

The BIA's decision will be upheld if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). Under this standard, we may reverse if a petitioner's evidence "not only supports a contrary conclusion, but indeed compels it." *Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992). To reach this conclusion, we ask whether evidence "was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Elias-Zacarias*, 502 U.S. at 481. Where, as here, the BIA issues its own decision in which it affirms portions of the IJ's decision, "we review the BIA's decision as the final agency determination," and review the IJ's decision "[t]o the extent the BIA adopted the [IJ's] reasoning." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citations omitted).

## A. Asylum.

An alien must file an application for asylum within one year of arriving in the United States in order to be eligible for relief. 8 U.S.C. § 1158(a)(2)(B). We lack jurisdiction to review a denial of asylum for untimeliness unless a petitioner seeks review of "constitutional claims or matters of statutory construction," rather than mere discretionary or factual findings. *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006).

Petitioners contend that they meet the jurisdictional exception and argue that the BIA's decision is inconsistent with "regulations and law." They assert that their asylum applications should be deemed filed the date that their motion to reopen was filed and that "[t]he date used as the starting point [of the window to file for asylum] should be the date [Kbilashvili] was detained as this is the first time he knew what was happening in his case." Because Kbilashvili "exercised due diligence up until that point and did not realize what [Melikiganov] had done," he argues that the filing period should have been tolled. Petitioners cite to no case law nor offer any legal argument in support of their position.

We entertained a similar argument by the petitioners in *Khozhaynova v. Holder*, 641 F.3d 187 (6th Cir. 2011), who challenged the BIA's factual findings as to whether they filed their asylum applications within a reasonable period given their circumstances. 641 F.3d at 191-92. Petitioners here attack the BIA's factual determination that Kbilashvili failed to exercise due diligence in dealings with Melikiganov which could create extraordinary circumstances sufficient to justify delay in his application. For this reason, Petitioners' argument is "exactly the type of factual, discretionary determination that [courts] are jurisdictionally barred from reviewing." *Yong Lai Lian v. Holder*, 414 F. App'x 790, 794 (6th Cir. 2011). Therefore, we lack jurisdiction to consider the BIA's ruling of Petitioners' applications as untimely and dismiss the petition as it pertains to their asylum claims.

## B. Withholding of Removal and CAT Protection.

Petitioners next challenge whether we should reverse the IJ's adverse credibility finding against them regarding their applications for withholding of removal and CAT protection. In order to qualify for withholding of removal, Petitioners must show that there is a clear probability that they

would be subject to persecution on the basis of their "race, religion, nationality, membership in a particular social group, or political opinion" if they returned to Georgia. *Khozhaynova*, 641 F.3d at 192-93 (citing 8 U.S.C. § 1231(b)(3)(A); *Vincent v. Holder*, 632 F.3d 351, 354 (6th Cir. 2011)). If Petitioners can establish past persecution, they are "entitled a rebuttable presumption that [their] li[ves] or freedom would be threatened if [they] return[]." *Khozhaynova*, 641 F.3d at 193. If their fear is unrelated to past persecution, then they "bear[] the burden of demonstrating that it is 'more likely than not' that [they] will be persecuted on the basis of one of the five protected grounds if [they] return." *Id*. at 193. To be eligible for protection under the CAT, a petitioner must establish that he or she would be subject to torture by or at the instigation of or with the acquiescence of a public official or person acting in an official capacity. *See* 8.C.F.R. § 1208.18(a)(1).

Credibility determinations are reviewed under the substantial evidence standard. *Abdallahi v. Holder,* 690 F.3d 467, 472 (6th Cir. 2012). Credibility determinations concerning applications for withholding of removal and CAT protection filed on or after May 11, 2005 are governed by the REAL ID Act, 8 U.S.C. § 1158(b)(1)(B)(iii). Under the Act, a trier of fact must make a credibility finding based upon the totality of the circumstances and all relevant factors. *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a). However, "a failure to provide corroborating evidence when it is reasonably available may support an IJ's adverse credibility finding." *Matias-Pablo v. Holder*, No. 12-3819, 2013 WL 1235654, at *8 (6th Cir. Mar. 28, 2013).

Petitioners argue that they suffered from past persecution in Georgia due to Kbilashvili's political opposition to corruption and that they more likely than not will be persecuted if they return. After reviewing Petitioner's testimony and submitted evidence, the IJ questioned Petitioners' credibility, concluding that while Kbilashvili's testimony was "generally consistent," there were "a few discrepancies and/or inconsistencies that [were] worthy of mention." First of these was Kbilashvili's account of being attacked in his vehicle, which he indicated during closing remarks was a consequence of his opposition to government corruption. However, he failed to provide corroboration of this explanation, and it contradicted a statement submitted by his neighbor who recalled that when she asked Kbilashvili what had transpired, he indicated to her that he was the victim of an attempted automobile theft. Second, the IJ found that Petitioners failed to corroborate their testimony regarding the attack on Emzar in February. Kbilashvili testified that Emzar could not explain what had happened and could not provide any other details of the attack. On the other hand, Akhvlediani testified that one of the attackers stated to Emzar that the attack was motivated by their inability to harm Kbilashvili himself. Third, the IJ, in reviewing all of the evidence before it, found that Petitioners failed to corroborate their testimony regarding additional attacks on Emzar and threats made to their brother with any reasonably available evidence and had failed to establish the unavailability of such evidence. No statement or letter was offered by Petitioners' son or brother to bolster these factual allegations. Fourth, the IJ observed that despite Petitioners' multiple accounts of attacks and resulting hospitalizations of their son, no hospital records of such events were produced. Fifth, the IJ noted that although Petitioners testified that their children, who were living with their grandparent, were constantly forced to relocate during the last several years for fear

of attacks, no letter or affidavit to this effect was submitted. Finally, the IJ observed that Kbilashvili presented no corroboration of his story from one of his former colleagues, the head of the prison system, who pledged his support to Kbilashvili and had allegedly helped him throughout many of the alleged events. The IJ concluded not only that Petitioners lacked credibility due to the inconsistencies presented and absence of corroboration, but also that they failed to a establish the requisite nexus between the alleged events and a protected ground warranting relief.

Petitioners insist that their failure to provide corroborating evidence should not bar their claim because the IJ failed to request specific corroboration for the events in question. They contend that it was unreasonable for the IJ to expect further corroboration "in light of the failure of the Court to ask about the statements." Although Petitioners find support for their position in precedent from the Second and Third Circuits, which require IJs to inquire as to whether corroborating evidence has been provided, *see Fisenko v. Holder*, 336 F. App'x 504, 511 (6th Cir. 2009), we have not endorsed this view. Therefore, it was reasonable for the IJ to expect Petitioners to produce corroborating evidence where the record presented inconsistencies. *See id.* Considering the record as a whole, the inconsistencies described by the IJ support an adverse credibility determination about Petitioners' past persecution because they reveal the absence of a nexus between the alleged events and Kbilashvili's political stance and, moreover, the uncertainty of whether these events occurred at all.

## C. Motion to Reopen.

We review a denial of a motion to reopen a removal order for abuse of discretion. *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003). Abuse of discretion is shown where an IJ or the BIA offers no "rational explanation, inexplicably depart[s] from established policies, or rest[s] on an

impermissible basis such as invidious discrimination against a particular race or group." *Balani v. INS*, 669 F.2d 1157 (6th Cir. 1982). In their motion to reopen, Petitioners submitted statements from their children explaining the motivations behind attacks in 2009 and 2011, and medical records from Emzar's treatment following his 2009 attack. The BIA held that the submissions did not sufficiently demonstrate changed circumstances materially affecting Petitioners' eligibility for asylum and that, regarding Petitioners' applications for withholding of removal, the submissions did not establish the requisite nexus between the harm feared by Petitioners and a valid ground for protection. Regarding Petitioners' application for CAT protection, the BIA held that Petitioners failed to make a prima facie showing that it would be more likely than not that they would be tortured upon their return to Georgia.

"Evidence can support a motion to reopen proceedings only if it was 'not available and would not have been discovered or presented at the previous proceeding.'" *Bushati v. Holder*, 458 F. App'x 457, 459 (6th Cir. 2012) (quoting 8 U.S.C. § 1229a(c)(7)(C)(ii)). Most of the evidence presented by Petitioners, including Emzar's medical records and accounts of attacks in 2009, was available in 2009 and should have been presented then. As for Petitioners' remaining evidence of Nino's attack in 2011, they are unable to show that the BIA abused its discretion in holding that the evidence lacked the requisite nexus between the attack and either a well-founded fear of persecution on the basis of a protected ground or a likelihood of torture. The BIA explained its decision, which was in compliance with established policies, and Petitioners have not alleged that the BIA's decision rested on an impermissible basis. The BIA found that Petitioners' motion to reopen failed to establish a *prima facie* case for their requested underlying relief because the evidence submitted did

not sufficiently demonstrate a nexus between the harm asserted and a protected ground for relief.

Therefore, the BIA did not abuse its discretion to reject the newly submitted evidence as grounds for

reopening Petitioners' applications.

**THE PETITIONS FOR REVIEW ARE DENIED.**